No. 23,269.

J. H. SIMMONS, *Appellee*, v. FREDERICK A. OATMAN et al., *Appellants*.

SYLLABUS BY THE COURT.

1. AGENCY—*Evidence of Employment—Services Accepted.* The evidence is held sufficient to support a finding that a firm of broom corn buyers invited and accepted the services of a scout, agent or broker, and thereby became his employers and were liable to him for a commission.

2. SAME—*Competent Evidence to Show Employment.* Evidence that an agent of the defendants asked the plaintiff to accept less than the usual commission is held to have been admissible as tending to show it was understood that the plaintiff had been employed by the defendants.

3. SAME—*Action for Commissions—Theory on Which Case Was Tried.* It is held that the case was tried throughout on the theory that in order for the plaintiff to recover it was necessary for him to prove that he had been employed by the defendants, and that references to a trade custom related to the amount of commission to be paid in the absence of an agreement on that point, and the services required to earn such commission.

4. SAME—*Plaintiff Not a Commission Merchant.* It is held that the plaintiff in the transaction upon which he sued was not acting as a commission merchant, and therefore the want of a license as such was not a bar to his recovery.

5. SAME—*Federal Tax on Commercial Brokers—Effect of Nonpayment of Federal Tax.* Under a Federal statute imposing a tax on commercial brokers and penalizing but not otherwise forbidding the engaging in the business without paying it, the nonpayment of such tax is not a bar to the recovery of compensation for services rendered in the course of that calling while such delinquency existed, and this regardless of whether or not a decision to the contrary would result from following the rule of an earlier case based on a Kansas statute, which has been adhered to on the principle of *stare decisis.*

Appeal from Sedgwick district court, division No. 2; THORNTON W. SARGENT, judge. Opinion filed December 10, 1921. Affirmed.

*Fred B. Stanley, Claude C. Stanley, Benjamin F. Hegler, Kos Harris, V. Harris,* and *Vincent F. Hiebsch,* all of Wichita, for the appellants.

*A. L. Noble, Hal M. Black, C. A. McCorkle,* and *J. D. Fair,* all of Wichita, for the appellee.

The opinion of the court was delivered by

MASON, J.: J. H. Simmons sued Frederick A. Oatman and his two partners for a fee or commission for services rendered them as scout, agent or broker in assisting them in the purchase of a quantity of broom corn. He recovered a judgment, and the defendants appeal.

1. The defendants assert that there was an entire failure to show that they either expressly or impliedly employed the plaintiff to perform any services in their behalf, or that they accepted or ratified acts on his part claimed to have been done for them.

There was evidence tending to show these facts: The defendants were in the business of buying and selling broom corn, operating in southwest Kansas, their headquarters being at Wichita. The plaintiff was engaged in buying, selling, looking up and locating broom corn. In 1914 he had bought broom corn from them and sold it to them, turned broom corn to them on a commission and bought it for them on commission. In November, 1915, the plaintiff met Oatman at Liberal, who said to him: "I want you to keep me informed and let me know where you are, because I want you to buy some broom corn later on." In the same month the plaintiff learned that one J. H. Johnson, who had assembled some 550 tons of broom corn, most of which was in a storehouse in Liberal, was willing to sell it all because of ill health. Johnson told the plaintiff that he wanted all he could get but would sell it right if the plaintiff would find a buyer—that he would as soon the plaintiff would have the money he could get out of it as anyone else. The plaintiff at once wired to Roy Findlay, the defendants' agent, who was then on his

way from Elkhart to Liberal: "Chance to buy big block." Findlay answered at once, "Will be in Liberal this p. m." That afternoon Findlay, accompanied by S. C. Keeley, field buyer and manager for the defendants, and B. W. Wasserman, the representative of another broom corn buyer, who bought broom corn with the defendants, or from them, and for whom they bought, met the plaintiff at the hotel, where Findlay asked the plaintiff what was doing. They all went to the plaintiff's room to clean up. While there they asked him if he couldn't show them the broom corn without somebody butting in, he answering that he could. When he told them what broom corn he referred to in his telegram they said nothing about having seen Johnson; they asked him to show it to them—to take them over there. After they had eaten lunch they said: "Let's go over there and look at the corn." They all went to the storehouse, where the plaintiff climbed upon the pile of broom corn and threw samples down to Findlay. Keeley called the plaintiff into the door of the warehouse and asked him if he wouldn't cut his commission, having some argument with him about it, and asking him to think it over. Keeley told the plaintiff: "I don't know whether they are going to pull the deal off as Mr. Wasserman don't seem to take hold"; and later, "Findlay is going to buy it, whether Wasserman buys it or not; is going to take a chance on it." Still later Keeley asked the plaintiff to cut his commission to $2.50 a ton. The broom corn was bought by the defendants and Keeley shipped it out, the plaintiff being ready and willing to assist him, but not being called upon. The plaintiff admitted that it was generally known that Johnson had a quantity of broom corn but asserted that the fact communicated to him by Johnson that he was willing to sell at that time was not known to buyers. By the custom in the broom corn trade the buyer rather than the seller paid an agent's commission, and the agent who had produced a seller was expected to see to shipping the broom corn if this was desired, the ordinary commission being $5 a ton.

That some of this evidence was contradicted is of course not now important. We regard it as sufficient to authorize the jury to conclude that the defendants knew that a part of the plaintiff's business was to find broom corn for buyers; that they understood his telegram to Findlay to be an offer of his services in that capacity; that they invited and accepted his assistance, profited by the information he had given them, asked him to show them the broom corn,

bought it by reason of the aid he had given, and became liable to him for the value of his services.

2. The plaintiff's testimony that Keeley asked him to reduce his commission was objected to on the ground that Keeley had not been shown to have authority to bind the defendants by a contract to pay the plaintiff for his services, or to have attempted to do so. The plaintiff testified that Keeley was the field buyer and manager for the defendants; that the plaintiff had bought broom corn for him and been paid by him with the defendants' checks. We hold the evidence to have been competent as tending to show that it was understood by the defendants' representatives who were engaged in the transaction that the plaintiff was to be compensated by the defendants for his services, and that they were worth more than $2.50 a ton.

3. The petition contained language which the defendants interpret as meaning that a custom in the broom corn business existed by which a broker or agent was entitled to compensation for services rendered without employment. The plaintiff took the position throughout that the allegations regarding custom related only to the matters (where there had been an actual employment) of the commission to be paid in the absence of an agreement on that point, and the character of services to be rendered to earn such commission. The defendants regard expressions in the instruction as countenancing the idea that a recovery might be based on a custom to pay for volunteer services. Taken as a whole, however, we think the instructions made it sufficiently clear that there could be no recovery by the plaintiff without proof of his having been employed by the defendants. It is suggested that in the course of the trial the plaintiff disavowed a claim of there having been a contract of employment, but the meaning appears to have been that an express contract was not at the time sought to be proved by a particular witness. The defendants complain that an offer by them to show that there was no custom to pay for volunteer services was rejected, while the court submitted to the jury a special question in effect asking whether such custom existed. That interrogatory, however, we regard as relating to the custom as to what services an agent who had been employed was required to render in order to earn the customary commission.

4. It is contended that the plaintiff cannot recover because he had not obtained either a state or federal license as a commission merchant. In this transaction the plaintiff had not acted as a com-

mission merchant; he had not in the terms of the state law (Gen. Stat. 1915, § 10385) received or sold or offered to sell on commission any kind of farm produce, nor in the terms of the federal law (38 U. S. Stat. 752, Sess. II, ch. 331, § 3, subdiv. 10) received into his possession any goods, wares or merchandise to sell the same on commission. Therefore these statutes cannot affect his right to collect compensation for his services.

5. The plaintiff had, however, no federal license as a commercial broker. The portions of the act of congress which affect this phase of the matter read:

"That on and after November first, nineteen hundred and fourteen, special taxes shall be, and hereby are, imposed annually as follows, that is to say:

, ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"Fourth. Commercial brokers shall pay $20. Every person, firm, or company whose business it is as a broker to negotiate sales or purchases of goods, wares, produce, or merchandise, . . . shall be regarded as a commercial broker under this Act.

⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"And every person who carries on any business or occupation for which special taxes are imposed by this Act, without having paid the special tax herein provided, shall, besides being liable to the payment of such special tax, be deemed guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not more than $500, or be imprisoned not more than six months, or both, at the discretion of the court." (38 U. S. Stat. 750, 751, 753.)

This court has held that where a city ordinance imposes a license tax and forbids and punishes by fine the carrying on of a business to which such tax applies without paying it, no recovery can be had for services rendered in the course thereof by one who had not paid the tax. (*Yount v. Denning,* 52 Kan. 629, 35 Pac. 207.) It has also, while criticizing the doctrine there applied and expressing doubts of its soundness, refused to overrule the case, but explicitly upon the principle of *stare decisis* and upon the specific ground that the legislature by its inaction should be deemed to have accepted the rule of statutory construction there adopted, and with the suggestion that the rule should be restricted rather than enlarged. (*Draper v. Miller,* 92 Kan. 275, 140 Pac. 890, and cases there cited.) A distinction is to be noted between that case and this one. There the ordinance in so many words provided that no person should carry on the business without having paid the tax and obtained a license to do so. Here the statute imposes the tax and without in terms forbidding engaging in the taxed occupation prior to paying

the tax provides a penalty for such conduct, characterizing it as a misdemeanor. The ordinary rule of course is that to penalize an act is to render it illegal and incapable of forming a valid consideration for a contract. (13 C. J. 421.) This is universally so when the prohibition is in the nature of a police regulation for the general protection of the public morals or welfare. But the question is always one of legislative intent, and the modern and more reasonable view appears to be that "if the penalty is imposed for the protection of the revenue, it may be presumed that the legislature only desired to make it expensive to the parties in proportion as it is unprofitable to the revenue, and that their contracts are not void." (13 C. J. 422; see, also, Id., 423; 6 R. C. L. 701-705, and notes.) The same principle is given effect although the statute contains an express prohibition of engaging in business without the payment of the tax. A typical recent case is *Lloyd v. Johnson,* 45 App. D. C. 322. The present question is as to the meaning of an act of congress, and in the absence of a controlling federal decision must be resolved according to the general law rather than according to the local law of Kansas. It does not appear to have been passed upon by the supreme court of the United States. The opinion in an early case contains some expressions favorable to one view and some favorable to the other, the decision not being conclusive either way. (*Harris v. Runnels,* 53 U. S. 79.) Irrespective of whether the Yount-Denning case was originally well decided and whether if accepted as sound it would control here if the matter were one of state law, we think by the weight of the more recent authorities and by the better reason the fact that the plaintiff had not paid the twenty-dollar federal tax upon his occupation as a commercial broker is not available to the defendants to defeat his otherwise valid claim for compensation for services rendered in that capacity.

The judgment is affirmed.