No. 25,113.

The City of Washington, *Appellant*, v. Brown-Crummer
Investment Company, *Appellee*.

### SYLLABUS BY THE COURT.

Contract—*Purchase of City Improvement Bonds—Breach of Contract by
Purchaser—Action for Damages—No Accord and Satisfaction or Other
Defense Shown—Demurrer to Plaintiff's Evidence Wrongfully Sustained—
Plaintiff Entitled to Judgment*. In an action to recover on a breach of con-
tract for the purchase of an issue of city improvement bonds, the facts
considered, and *held*, that demurrer to plaintiff's evidence was erroneously
sustained; and that any delay on the part of the city in issuing the bonds
was waived by defendant when it received the bonds and retained them
and haggled with the city for a settlement on other terms than those
specified in its contract of purchase; that the defenses of the city's delay,
and of accord and satisfaction, raised jury questions; but *held*, also, that
the controlling and admitted facts entitle plaintiff to judgment.

Appeal from Sedgwick district court, Division No. 1; Thomas E. Elcock,
judge. Opinion filed November 8, 1924. Reversed.

*L. A. Hasty*, of Wichita, *S. H. Hamilton*, of Washington, *Charles L. Hunt*,
and *C. J. Putt*, both of Concordia, for the appellant.

*Chester I. Long, Joseph D. Houston, Austin M. Cowan, Claude I. Depew,
W. E. Stanley, James G. Norton, James G. Martin*, and *W. B. Harms*, all of
Wichita, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This was an action to recover on a breach of con-
tract for the purchase of an issue of improvement bonds which the
plaintiff city sold and delivered to the defendant investment com-
pany. The defense was that the delivery of the bonds was so long
delayed that defendant was not bound to accept the bonds at the
agreed price, and that the incidental rights and liabilities of the
parties were settled by accord and satisfaction.

The facts were mainly these: In 1919 the city of Washington
undertook to pave some of its streets. The defendant, desiring to
buy the bonds which would have to be issued to pay for such im-
provements, offered to advance the funds on condition that it might
buy the bonds if they were declined by the state school-fund com-
mission, which by statute had the first refusal of them. This offer
was accepted and reduced to writing on November 3, 1919, the
parties stipulating that the bonds should be dated November 1, 1919,

bearing 5 per cent interest, and should be sold to defendant and paid for at par; and defendant agreed to furnish blank bonds ready for execution and furnish the services of their attorney in directing the legal proceedings, and to pay all other necessary expense incidental to the bond issue without charge to the city. It was also agreed that defendant should advance the money to meet the monthly estimates of the engineer, due the contractor for the work completed during each month, without any interest charge therefor other than that evidenced by the interest coupons on the bonds, predated as of November 1, 1919. It was also stipulated that if the school-fund commission should exercise its preference right to buy the bonds, the city was to reimburse the defendant for the moneys advanced to pay the monthly estimates of completed construction work and 6 per cent interest thereon, and to pay the defendant's actual expenses, not exceeding $200. It was also agreed that the city should deliver the bonds as soon as it was possible under the law to do so.

Pursuant to this contract the defendant advanced to the city on the engineer's successive monthly estimates the sum of $27,848.68. The total bond issue was $62,360. Defendant endeavored to speed up the governmental processes of the city so that the bonds might be issued in time to take advantage of the February bond market, which is always more brisk and favorable than it is after March 1, when all nonexempt assets of prospective investors must be listed for taxation. But official action by the city moved too slowly to get the bonds ready for delivery in February. First one city attorney and then his successor had to satisfy themselves of the validity of the proposed bond ordinance and of the form and recitals of the bonds prepared by defendant's attorney for the adoption and approval of the mayor and council. This necessarily took some time. Then there were assessments to be estimated and levied, and notices given to taxpayers, and the taxpayers had to be accorded the statutory interval to pay their special assessments before the total bond issue could be definitely determined. This necessary but considerable interval of time involved no great hardship on defendant, because by its contract it was to receive the bonds at par, bearing 5 per cent interest dated the preceding November 1, or, failing that, it was to have its advancements returned plus 6 per cent interest thereon. Defendant chafed at the delay because of a declining bond market, and on March 18, 1920, in a letter to the city clerk transmitting the proposed bond ordinance prepared by it for the city's

adoption, and giving instructions touching various details of the proceedings, it added the following:

"There has been some delay in the delivery of these bonds to us, although we have endeavored to do everything possible to expedite the delivery of the same. As we will not receive the bonds until considerably after March 1, as was contemplated at the time we entered into this contract, we are forced to place them on the market at considerable loss. If you are familiar with financial market conditions you can readily see that it will be necessary for us to sustain quite a loss in the sale of these bonds.

"Owing to the fact that we have endeavored to accommodate the city in this change in our contract, which will render the bonds a little less attractive to investors, and the fact that there has been some delay on the part of the city in passing the necessary proceedings providing for the issuance of the bonds, we feel that you should in some way share a part of this loss with us.

"We believe that it would be no more than right for the city to allow us some several hundred dollars on account of our concessions in this matter."

On April 19, 1920, the defendant wrote to the mayor:

"It is to say the least a bitter disappointment to us and me personally that the paving bonds have not been delivered long before this date, as was anticipated in the contract at the time it was taken.

"The market is getting worse, and it would be absolutely impossible for us at this late date to dispose of this bond issue at a profit."

The mayor answered:

"In replying to yours of the 19th inst. will say that we too very much regret that the issuance of bonds has been delayed. The reason for this, however, is that the form of ordinance submitted by your attorney does not meet the approval of our city attorney. Mr. Smith, who was formerly city attorney, refused to approve the ordinance and held that it did not conform to the law. Mr. Frank McFarland, our present city attorney, advised the council in like manner. The city council do not feel justified in passing an ordinance contrary to the advice of the city attorney. If the ordinance is in conformity with the statutes, I would suggest that you have your attorney take the matter up with Mr. McFarland and show him wherein there is no conflict."

The defendant replied:

"We have your letter of the 20th inst. relative to the delay in the delivery of your paving bonds, also the controversy over the bond ordinance.

"It is somewhat of an unusual occurrence that a city will fail to pass the form of bond ordinance prepared by our attorney, as several million dollars' worth of Kansas bonds have been issued on his ordinances during the last few years without any controversy whatsoever. We do not feel that we are responsible, or should stand the loss that might be incurred through your attorney's advice to the city to the extent of interfering with the completion of your proceedings when same is submitted by us correctly. We feel that your city has delayed the issuance and delivery of these bonds to such an extent

now that we do not feel obligated to accept them on the terms set forth in our contract, under date of November 3, 1919.

"If your city does not feel satisfied with the passage of the ordinance which has been prepared for us by our attorney it will be entirely satisfactory with us for you to' take up the advancements made to you at 6 per cent interest from their date, and you may keep the bonds.

"We call your attention to paragraph No. 2 in our contract, which provides that the city of Washington agrees to deliver the bonds to us as soon as possible under the law to do so."

After further investigation by the city attorney as to the operative interpretation of the law touching the form of the bonds, the city clerk on April 27, 1920, advised defendant that a special meeting of the city council would soon be called and the bond ordinance adopted.

On May 3, 1920, defendant wrote to the city clerk for certain data concerning the city's actual and assessed valuation, total indebtedness, etc., for the avowed purpose of completing its records touching the bonds in question, and on May 6 it wrote for a copy of the ordinance as finally adopted, with proof of its publication.

On June 4, 1920, the bonds were delivered to the agent of defendant, the same agent who had officiated in its behalf since the making of the contract between the parties, November 3, 1919, and he gave a receipt therefor:

"Received from L. T. Asche, city clerk, Washington, Kansas, $62,360 improvement bonds of said city, for the purpose of registration with the state auditor, to be remitted for when accepted by The Brown-Crummer Company, Wichita, Kansas, according to contract dated Nov. 3, 1919.

"The Brown-Crummer Company,
"(Signed)   C. W. Bradberry."

The record is not clear as to when and by whom the bonds were offered to the school-fund commission, but apparently they had been offered and declined by June 8, as on that date the defendant addressed to the mayor:

"June 8, 1920.
"Our Mr. Bradberry has handed us the $62,360 of improvement bonds of your city, which you turned over to him under a receipt stating that we were to remit for the same when accepted by us.

"We wrote you on April 22, owing to the delays attributable only to your city in this matter, we were not obligated to accept them on the terms set forth in our contract of November 3, 1919.

"We have advanced your city $27,848.68 to date, and will hold enough of the bonds at the prevailing market price to reinburse us for the amount advanced your city, together with the legal rate of interest (6%) for funds advanced you.

City of Washington v. Investment Co.

"We do not wish to appear to be taking an arbitrary stand in this matter, but do not feel like holding ourselves responsible for a loss due entirely to the city's action.

"Mr. Bradberry advises us that you intend to draw an additional draft upon our company. The only way we can pay the same is to have an understanding with you that we are to hold sufficient of these bonds at the prevailing market price, plus expenses in the matter, to compensate us for paying the same. We are advised that this draft will be for about $17,000. There will then be a small balance of bonds remaining in our hands, and if you desire us to do so, we will be pleased to sell them on the market, deduct our legal expenses, and remit the balance of the proceeds to your city when the bonds are sold by us.

"Please let us hear from you in regard to this matter, as we do not wish to take any action that would embarrass the city in any way in this matter, but must do everything possible to protect ourselves in the situation which has developed.

"We are enclosing a letter of our attorney setting forth some additional requirements needed to complete the transcript leading up to the issuance of these bonds."

Under instructions from the city government, the city attorney replied, acknowledging receipt of defendant's letter and stating that defendant would be held to its contract. In part it read:

"We ask that our draft be paid and that you otherwise comply with the contract, but we will make no promise at this time that binds the city to the payment of any sum of money to you outside of that provided in the contract."

On June 17, 1920, defendant's attorney replied to the city attorney, in part:

"The city has not carried out its contract with us either in spirit or letter and we do not believe that there is any court in this country that would compel us to accept these bonds at this time. We only ask what is right in the matter; that is, that the city repay us the $27,848.68 which we have advanced it, together with interest at the rate of 6 per cent. If the city has funds on hand to repay us this amount and interest at this time we would like to have the same; if not, we can only protect ourselves in the manner indicated in our letter of June 8, 1920, to you, and shall immediately take steps accordingly. The remainder of the bonds are held subject to any disposition you desire to make of the same."

Eventually the mayor, the city attorney and the president of the city council went to Wichita to meet the managing officers of defendant, and insisted that defendant observe its contract. Defendant offered to give the city 95 cents on the dollar for the bonds less 2 cents on the dollar as commission for selling them, which would net the city 93 cents on the dollar for the bonds. This and other

various offers and demands of defendant were declined. About this time plaintiff learned that the bonds could be sold to the Prudential Trust Company in Topeka, and defendant agreed to send a representative to Topeka with the bonds, and accordingly the bonds were sold by plaintiff and delivered by defendant to the Prudential Trust Company for $57,994.80, plus $2,550 for accrued interest, totaling $60,544.80, which was $1,815.20 less than the agreed price between plaintiff and defendant. As part of this tripartite transaction there was also an arrangement between the parties whereby the Prudential Trust Company withheld enough of the purchase price to satisfy defendant's advancements to the city, $27,848.68, plus its demanded exaction of interest thereon, $957.05, and this latter sum, together with the $1,815.20 drop below par at which the Prudential Trust Company purchased the bonds, caused a consequent aggregate loss of $2,772.25 to the city.

Hence this lawsuit. Plaintiff set up three causes of action—one relating to the loss attendant on the sale of the bonds to the Topeka company for a less price than defendant had agreed to pay; and another relating to the $957.05 exacted by defendant as interest on its advancements to the city to meet the monthly payments to the contractor pursuant to the engineer's estimates. A third cause of action, relating to plaintiff's expenses necessitated by defendant's alleged wrongdoing, was abandoned.

Jury trial. Defendant's demurrer to plaintiff's evidence sustained, and judgment entered for defendant.

Plaintiff appeals, assigning various errors, the chief of which, of course, was the taking of the case from the jury on a demurrer to plaintiff's evidence. It may be unnecessary to consider *seriatim* all the specific errors assigned.

Whether or not there was such delay on the part of the city in taking the various procedural steps leading up to the execution and issuing of the bonds as would constitute a breach of the city's contract with defendant was surely a fair question for a jury to settle. The governmental processes of a third-class Kansas town are naturally somewhat slow, and they ought to be deliberate. There were resolutions concerning the proposed improvements to consider, debate and to determine upon. Perhaps there were petitions of property owners to consider and dispose of. There were contracts to let; contractor's bonds to scrutinize and approve; appraisers had to be appointed; assessments had to be made and an ordinance or resolu-

City of Washington v. Investment Co.

tion pertaining thereto had to be considered, adopted and published; the specially concerned taxpayers had to be notified of their assessments and they had thirty days' time in which to pay their assessments before the amount of the bond issue could be accurately determined. After all this, in methodical and deliberate order, there would come the enactment of a proper ordinance authorizing the bond issue. That enactment would and should be taken with deliberation and without undue haste or want of care. Then the preparation and execution of the bonds would also need to be undertaken with prudence and circumspection. Among the matters which caused delay was the hesitancy of the successive city attorneys to give their official and professional approval to the form of bonds and bond ordinance prepared by defendant. Defendant's attitude seems to have been that such approval should have been given offhand, without taking time for investigation and to learn by inquiry among other city attorneys and otherwise that the form of bond and bond ordinance prepared by defendant was legal, at least by operative interpretation. As eventually the city attorney did approve the form of bond and bond ordinance, and conceded their legality in this action, the trial court apparently adopted defendant's view of these matters. When plaintiff sought to elicit the fact that its city attorneys, one after another, had seriously questioned the validity of the form of bonds and bond ordinance, defendant's objection to the testimony was sustained. The record reads:

"[Counsel for plaintiff]: It is offered for the purpose, if your honor please, of showing that the city, while it is conceded by the admission here in court that the ordinance was in proper form, it is offered for the purpose, as stated in the pleadings, that there was a disagreement about the form of the ordinance, which disagreement was one in which both parties acted in good faith, which, we think, takes it out of the rule of delay.

"The court: Inasmuch as it is conceded that they were right, I wouldn't think that the fact that you could not be made to understand that for some time would make any difference."

"[Counsel for plaintiff]: The city may not have known it then.

"The court: The objection will be sustained. . . .

"[Counsel for plaintiff]: I might add just this: that the pleadings show that, allege that, there was a *bona fide* disagreement between counsel for each of these parties upon that subject and the delay was occasioned by that disagreement, and that pleading has not been attacked by motion or otherwise.

"The court: What you are trying to do now is to prove that for a time during these negotiations your side of the controversy was contending for something that was wrong, and that while you were so contending you ought to have time out."

We think these rulings were erroneous. The city attorneys were not in a position of mere rubber stamps to give perfunctory sanction to the form of ordinance and bonds prepared by defendant for the city's adoption and execution. It is not a mere question whether the city attorneys were right or wrong in their view of the law. They certainly were in the right when they took time for deliberation and patient study of the legal questions involved before giving their approval to the form of bond and bond ordinance submitted. It would have been gross neglect of their official and professional duty to have approved them without such investigation, and the city was entitled to a reasonable interval of time while its attorneys made that investigation; and whether such interval was unduly protracted was a jury question and not one to be decided out of hand by the court on a demurrer to plaintiff's evidence. The other procedural steps leading up to the issue of the bonds also required some time; just how much time depended upon the attendant circumstances.

But whether or not there was unreasonable delay on the city's part in pursuing the various steps antecedent to the execution and issuing of these bonds is in reality a minor question—although a jury one—in this lawsuit. If the city's delay and failure "to deliver said bonds to us [defendant] as soon as it is possible under the law to do so" constituted a breach of contract which would have justified rescission by defendant, the latter did not exercise its right of rescission. Notwithstanding the delay it received the bonds into its possession and kept them, and only after three weeks of haggling with the city did it surrender them, and even then it only surrendered them upon the exaction of conditions which it had no right to impose and which the city had not and could not have freely and lawfully undertaken.

It cannot be pretended that the city parted with the bonds on June 4, 1920, except pursuant to its contract with defendant, and in the fullest confidence that as soon as the formality of their registration by the state auditor and of their offer to and rejection by the school-fund commission, the agreed purchase price less the advancements would be promptly paid by the defendant. Moreover, the defendant cannot be heard to say that it got possession of the bonds on any other theory or pretense. Or is it intended to be confessed that it was merely by some strategic ruse or questionable maneuver that defendant got possession of the bonds? If not

Vol. 117.	JULY TERM, 1924.	23
City of Washington v. Investment Co.

in conformity with its contract, what right had the defendant to meddle with the bonds in any way whatsoever? It is too clear for cavil that the defendant had no right to carry away the bonds except in conformity with its contract, and it is estopped to deny that it otherwise acquired possession of them. From this it follows that defendant must pay for the bonds according to its contract, unless the city's claim to the balance due thereunder was waived by the tripartite arrangement whereby the bonds were sold to the Prudential Trust Company at a less price than defendant had agreed to pay, and by its assent to their delivery to that company by defendant pursuant to such sale, and by its assent to a diversion of part of the proceeds, $957.05, to defendant to satisfy its demand for interest on its advancements to the city.

It would seem that even if the evidence tended to show that this tripartite disposition of the bonds was an accord and satisfaction, as pleaded by defendant, there would be a fair issue of fact for the jury, and there would be the further jury question whether such accord and satisfaction was freely made by the city and for a sufficient consideration. The plaintiff's evidence tended to show that this disposition of the bonds was not a settlement of the city's claim against defendant at all, but was, in the discretionary judgment of the city officials, the best course to take to get out of the predicament into which they had fallen by letting the bonds go out of their possession without getting cash in hand therefor. The mayor testified, among other material matters:

"I told him 'No'; . . . and what I wanted him to do was to go down and turn them over to the Prudential company and they would pay him the money, and we walked down to the Prudential company, and in the meantime and while we were sitting there I said, 'Now this is not a settlement of this affair at all, because we contend that we are entitled to our money as of contract of November 3d."

Surely such evidence as this could not be swept aside by a demurrer and judgment ordered against plaintiff.

But we have yet to consider what appears to be the controlling feature of this lawsuit. The outstanding point which constantly obtrudes at every stage of the case is the fact that there was a contract between the parties whereby plaintiff agreed to sell and defendant agreed to buy these bonds at a stipulated price, and pursuant thereto the plaintiff parted with its bonds and defendant got and kept possession of them and refused to pay for them according to its contract. In such a situation the city had a right to sell the

bonds elsewhere for the best market price reasonably obtainable and look to the defendant for the difference between that market price and the price defendant had agreed to pay. What rule of law or principle of equity can be suggested why defendant should not reimburse the city for this difference? Accord and satisfaction? A consideration is essential to a binding agreement by way of accord and satisfaction. Here there was none. Delay of the city? If there was any culpable delay, any lack of diligence on the city's part, defendant waived it when it received the bonds. To the suggestion that it received them on some sophistical pretense other than pursuant to its contract, this court can give no countenance. It had no right to receive them otherwise than according to the contract. The city never did surrender the bonds on June 4 on any other theory than that of compliance with the contract, and had no lawful power to do so. While it is true that an offer of the bonds to the school-fund commission had to be made before the sale to defendant could become absolute, yet, even so, defendant had no business with the bonds if it considered its contract for their purchase at an end. Defendant might have adhered to its contract and paid for the bonds in accordance therewith and laid a claim against the city for damages for delay in delivering the bonds with a consequent loss to defendant, and such an issue could have been pleaded —and perhaps proved—in this lawsuit. As the pleadings were drawn, however, there was no such issue. And thus it appears that not only was the court's ruling on the demurrer erroneous, but it appears that there is nothing further in this lawsuit to try, so the judgment of the district court must be reversed and the cause remanded with instructions to enter judgment for plaintiff for the difference between the sum realized by the sale of the bonds to the Prudential Trust Company and the contract price which defendant agreed to pay, plus the sum exacted and received by defendant out of the proceeds of the sale under claim of interest on advancements, plus interest on the aggregate of these sums computed from June 24, 1920.

It is so ordered.