No. 25,628.

F. H. Mitchell, *Appellee, v.* The Derby Oil Company, *Appellant.*

SYLLABUS BY THE COURT.

1. Broker—*Action for Services in Procuring an Underwriter for a Million-Dollar Bond Issue—Construction of Contract—Issue Stated.* In an action for a broker's commission for his services in procuring an underwriter for a million-dollar bond issue of an oil company, the errors urged against the judgment in favor of plaintiff examined, and *held* : (*a*) the trial court's instructions touching defendant's liability on an implied contract were not erroneous; (*b*) the evidence supplied all the requisites to fasten liability on defendant under an implied contract; (*c*) when plaintiff broker had procured an underwriter to take an option on a bond issue and the option was thereafter exercised, plaintiff's commission was earned; (*d*) the preliminary negotiations of the underwriter and the oil company, which only dealt with part of the bond issue, did not limit the sum due plaintiff for commission when he was in fact the procuring cause of the underwriting of the entire bond issue.

2. Same—*Brokers Commission—Evidence Considered—Broker Entitled to Commission as Prayed for.* Where a broker employed to find an underwriter for an issue of one million dollars' worth of industrial bonds did procure an underwriter who agreed to underwrite $100,000 of the issue upon condition that he should have successive hundred-thousand-dollar options on the next $300,000, which successive options were exercised by the optionee, and where without further formal contract the underwriter actually did underwrite and dispose of the entire million-dollar issue, the broker was entitled to his commission not only on the $100,000 included in the underwriter's specific obligation, but also on the bonds underwritten pursuant to the exercise of the underwriter's option, and on the remainder of the issue actually written and disposed of pursuant thereto.

3. Same—*Broker's Commission—Special Facts Found by the Jury—No Further Points of Dispute—Judgment Directed by Supreme Court.* When the pertinent and controlling facts at issue in a lawsuit are settled by a jury's special findings it is the duty of the trial court to enter judgment thereon; and in such case, on appeal or cross-appeal, where the record shows that there is no further point of dispute between the litigants remaining undetermined, and a new trial would serve no purpose, the supreme court has power, and it is its duty, to order such final judgment as justice requires under the mandate of the civil code, section 581, R. S. 60-3317.

4. Same—*Plaintiff Entitled to Judgment on His Cross-appeal as Prayed for.* The record, issues, evidence, admissions, and special findings of the jury, examined, and *held,* that plaintiff was entitled to judgment on his cross-appeal as prayed for in his petition.

Appeal from Sedgwick district court, division No. 2; Thornton W. Sargent, judge. Opinion filed January 10, 1925. On appeal, affirmed; cross-appeal, sustained and judgment ordered.

*Chas. G. Yankey, W. E. Holmes, D. W. Eaton,* and *John L. Gleason,* all of Wichita, for the appellant.

*Chester I. Long, Joseph D. Houston, Austin M. Cowan, Claude I. Depew, James G. Norton, W. E. Stanley,* and *W. B. Harms,* all of Wichita, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action to recover a broker's commission for plaintiff's services in obtaining an underwriting for a million dollars' worth of bonds issued by the defendant corporation.

The principal facts giving rise to this lawsuit are as follows:

In 1921 the plaintiff, F. H. Mitchell, was engaged as a broker of oil stocks in Wichita. He had formerly been an organizer of syndicates for handling Canadian real estate, and a stock and bond dealer in New York. He had several years' acquaintance with R. E. Wilsey & Company, a Chicago firm of underwriters of industrial securities, a brother of a member of that firm, Clarke, having been in plaintiff's employ in Canada. In 1921 A. L. Derby, president, and Dan F. Callahan, treasurer, of the Derby Oil Company, desired to sell half a million dollars' worth of oil stocks of the Derby Oil Company owned by them individually. They enlisted the services of a Wichita Trust Company, and the latter entered into an arrangement with Mitchell to dispose of this stock, but owing to unfavorable market conditions and the attitude of certain "blue-sky boards," the sale of this stock was not accomplished. The trust company which had been advancing $500 per month to Mitchell as a drawing account chargeable against his commissions, terminated that arrangement; and Mitchell, although apparently a man of some considerable means, became embarrassed for want of funds for personal expenses because his assets had been hypothecated to banks in Kansas and Oklahoma. Mitchell explained his financial embarrassment to Derby, and the latter, on behalf of himself and Callahan, offered to provide him with office room and to provide a drawing account for him until conditions improved. Derby said:

"'Now, Frank, things are not as bad as you think, and as regards your loans you are well secured, . . . and the bank people are friendly towards you, and you are good friends and they are good friends of yours, and I don't think that you ought to worry about that; commissions are getting a little better, and as regards making some money, Dan Callahan and I are working on a deal, framing up a deal that we will want to use you on, and until—a deal that will give you an opportunity to make some money, and if you need any money in the interim . . . I will speak to Mr. Moriarty,

and at the end of the month you ask Moriarty [Derby's secretary] and he will bring you in a check. . . .'

". . . You need not have any worry about that, because we are framup this deal, will be ready in a few days, and we will want to use you, and it will give you an opportunity to make quite a good deal of money.' . . . He said he didn't know whether I could make that much money or not, but he said I would probably be able to make ten, fifteen or twenty thousand dollars."

Pursuant to this arrangement Mitchell moved his desk into the Derby Oil Company's offices to save office rent, and for three or four months Derby's secretary, who was also secretary of the oil company, furnished him with funds of the company, charging the same to Derby and Callahan personally. These sums were $250 in August, 1921, $200 in September, and $200 in October. On the voucher for one of these sums the word "loan" appeared; on another "on acc't F. H. Mitchell" was written. By this same arrangement for funds, Mitchell's office rent for May and June was paid and likewise charged to the personal account of Derby and Callahan. During July, August and September Mitchell continued his efforts to sell the half million dollars' worth of Derby Oil stock owned personally by Derby and Callahan. About August 25 plaintiff Mitchell asked Derby if the defendant company would be interested in putting out a million-dollar bond issue. Derby answered in the affirmative. Mitchell inquired to what uses the proceeds would be put. Derby told him. Mitchell made a memorandum of the purposes outlined by Derby, and on August 30 wrote Wilsey & Company, explaining the proposed issue, and suggested that that firm should underwrite the issue, and invited investigation. On September 8 Wilsey & Company replied, discussing the dullness of the bond market, giving instances of unsatisfactory results of underwriting industrial bond issues during that year, expressing the hope that business would soon improve, and suggested that the Derby Company should borrow money for its temporary needs and await an upward trend of the oil business and then decide on a program of financing. On September 13, as Mitchell was about to leave Wichita for Philadelphia in an effort to dispose of that half million dollars' worth of oil stocks which belonged to Derby and Callahan, he asked Derby, president of the defendant company, what compensation he would receive if he secured an underwriting for a million-dollar bond issue. Derby replied that he would make it right with Mitchell.

En route for Philadelphia, Mitchell called on Wilsey & Company in Chicago and discussed the proposed bond issue and wrote to Derby:

"CHICAGO, ILL., Sept. 15, 1921.

. . . . . . . . . . . . . . . . .

"Wilsey has just returned from New York this morning and I have been with him for about an hour. While in New York he talked with the Daugherty people and a number of banking concerns. He states that they all feel very confident that the oil conditions will be greatly improved within possibly the next sixty days. He states that he would be very glad to handle a million-dollar bond issue for the Derby Company just as soon as conditions look at all favorable in the oil industry itself."

Mitchell went on to New York and called on a firm of underwriters there in regard to the proposed million-dollar bond issue, carrying with him a letter of introduction from a New York bank obtained for Mitchell by Callahan. Returning from New York, Mitchell again called on Wilsey & Company and discussed with that firm the proposed bond issue and then wired Derby:

"Sept. 28, 1921, Chicago, Ill.

. . . . . . . . . . . . . . .

"If you want to put out million of bonds Wilsey is interested and Clarke will return with me to Wichita after I get through at Appleton to complete arrangements for issue. Instruct me at Appleton."

Derby wired Mitchell to meet him in Chicago on his return from Appleton, Wis., and accordingly on October 4, pursuant to an engagement made by Mitchell, Derby and Mitchell went to the offices of Wilsey & Company, where the projected bond issue was discussed and preliminary plans outlined. Pursuant thereto and in the usual course of a transaction of such magnitude, the million-dollar bond issue. was authorized. Wilsey & Company did not bind themselves to underwrite the whole million-dollar issue. Their proposition dated October 12, 1921, was to underwrite $100,000 of this issue, upon condition that if successful in that underwriting they should have a sixty day's option on the second hundred thousand, and if it were also successful they were to have a similar option on the third hundred thousand, and on the same terms an option on the fourth hundred thousand. The written offer of Wilsey & Company containing this proposition included no stipulation for the underwriting of the balance of the issue; nevertheless, and although no further formal contract was ever made between Wilsey & Company and defendant, in about a year Wilsey & Company successfully underwrote and disposed of the entire million-dollar issue.

The plaintiff testified:

"Q. Did Mr. Derby, according to your remembrance of that conversation, say anything about limiting the amount of bonds that he was going to put out? A. No, not in just the way you are asking me. Mr. Derby asked Mr. Wilsey if it would be necessary to put out the whole million at the time, and Wilsey said 'No'; and Derby said all he could use right then would be $400,000, because he didn't want to take the other $600,000 and pay interest on that when he could not use it, and it would take some time to use a million dollars; and Mr. Wilsey said all right, he could put it out in that way, serial form as he wanted it, over the period of a year.

"Q. Then, Mr. Mitchell, the entire talk was not about putting out a million dollars' worth of bonds; it was limited to putting out $400,000? A. No, not at all; it was an issue of a million dollars' worth of bonds to be put out as needed."

Derby testified:

"Q. This letter is dated October 10th, isn't it? A. October 12th.

"Q. The 12th—is that the letter and the proposition upon which the bonds of the Derby Oil Company were issued so far as Wilsey & Company's connection with these bonds is concerned? A. That is the only agreement that we ever had, the only contract we ever had; that is a copy of it. . . . It was about 60 days, I think, before we called a directors' meeting. . . .

"Q. Mr. Mitchell in his testimony said that while you were in Mr. Wilsey's office you talked about a million-dollar issue. What talk, if any, was there about the amount of bonds? A. Well there was a talk on $400,000, and I told him I didn't think we could use that much money, that we didn't want it. I didn't want to have to pay interest on any money we were not using, and they might have spoke of a million there, but I don't think that a million was considered at all until after Mr. Wilsey was down here and we talked then, and all we talked of then was nothing but $400,000, and when Mr. Wilsey was here he insisted that we should authorize a million, and then it wouldn't do any hurt, as we could put it out whenever we wanted to. If we had it authorized, that later on if we changed our mind we could go ahead and put out more bonds on the same.

"Q. Under the same mortgage? A. Yes, under the same mortgage. . . .

"Q. But the mortgage did authorize the [issue] of a million dollars when you could comply with the conditions of the mortgage? A. I think that it does; it is in there, whatever it is.

"Q. You remember whether or not it was a million dollars, don't you? A. It was a million, yes."

Compensation for plaintiff's services as above was denied, and this action followed. Plaintiff sued for a 2 per cent commission for his services in finding an underwriter for the whole million-dollar issue. The jury answered some twenty-five special questions and returned a verdict in his behalf for $8,426.66, which was a 2 per cent commission on the first $400,000 of the bond issue underwritten by Wilsey & Company plus interest.

Plaintiff moved for judgment on the special findings of the jury and on the undisputed evidence for the entire sum demanded in his amended petition. This was denied.

Defendant likewise moved for judgment on the special findings. This was denied. Judgment for plaintiff was entered on the verdict, and defendant's motion for a new trial was denied.

Defendant appeals and plaintiff presents a cross-appeal.

Noticing first the errors presented by defendant, our attention is called to the jury's answer to defendant's questions 2, 3 and 4:

"2. On September 8th did Wilsey & Company decline at that time to underwrite a bond issue of the Derby Oil Company? A. Yes.

"3. If you answer the last question 'yes,' then state was there any contract of employment entered into for obtaining an underwriting of bonds between plaintiff and defendant, after that date? A. Yes.

"4. If you answer the last question in the affirmative, then state when and by whom said contract of employment was made and the terms of the same. A. Impliedly made by Derby Oil Co. through its president, A. L. Derby, on or about Oct. 4th, 1921, when Mitchell notified A. L. Derby by telegram that Wilsey & Company would consider a million-dollar issue of bonds, and how A. L. Derby impliedly consenting to same by actually going to Chicago and entering negotiations which finally led to the sale of the bonds."

The finding was that an implied contract of employment was made "after that date," September 8. It would be easy to give a false implication to that finding—that there had been no express or implied contract of employment concerning the bond issue *before that date*. Question 2, 3 and 4 really invited the jury to lay aside for the moment its comprehensive survey of the relationship of the parties, covering their antecedent dealings prior to and at the time when plaintiff Mitchell first conceived the idea of floating the million-dollar bond issue. Yet it is necessary that all these matters be taken into account to get a correct understanding of the controversy. The instruction to the jury in this connection is complained of. With its pertinent context it reads:

" . . . The plaintiff could be employed to procure an underwriter by an implied agreement.

"In determining whether there was such an implied agreement the acts and conduct of the parties should be looked into, and if under such circumstances Mitchell rendered services for the Derby Oil Company in procuring an underwriter, and that company accepted the work and benefit arising from the efforts of the plaintiff in securing an underwriter for the bonds, the defendant Derby Oil Company made the plaintiff its agent by an implied contract to procure an underwriter for the bonds in question. . . .

"If you find that the plaintiff Mitchell was in the employ of the Derby Oil

Company or A. L. Derby personally, or A. L. Derby as president of the Derby Oil Company, and was receiving compensation for such employment, and that as part of such employment it was his duty to perform such services as Derby might request him to perform, then to entitle the plaintiff Mitchell to recover compensation he must show by a preponderance of the evidence that he had an express contract with the Derby Oil Company. . . . Under such circumstances the plaintiff would not be entitled to compensation on an implied contract that as broker he should receive the reasonable value of his services for procuring an underwriter of the bonds."

Counsel say, "The primary fault or deficiency in the findings of the jury and in this instruction is that the appellee was allowed to recover upon his mere voluntary or uninvited action." But we have no case here of uninvited action of a mere volunteer. Such a defense was not even pleaded. The answer contained a general denial, and an allegation that plaintiff "rendered no service in connection with obtaining any underwriting of bonds of the defendant company"; but the main defense was made in support of the following allegations of defendant's answer:

"Defendant alleges that during the time referred to, and more particularly during the months of July, August, September and October of the year 1921, the plaintiff was in the employ of Mr. A. L. Derby and Mr. Dan F. Callahan, and under an agreed compensation, and which compensation was duly paid to and received by the plaintiff; that such employment required of the plaintiff that he perform for Mr. A. L. Derby, who was the president of the Derby Oil Company, any assistance, service or efforts of the plaintiff which the said Mr. A. L. Derby would need or require of him in assisting said A. L. Derby and looking after the affairs and business of the Derby Oil Company as its president. That at the same time the said the Derby Oil Company, in payment of such services which the plaintiff might directly or indirectly render to the Derby Oil Company in the promotion of its interests and affairs, said the Derby Oil Company furnished office space and paid the rent therefor for the plaintiff, and the defendant alleges that any services or assistance which the plaintiff might have rendered and given in connection with obtaining the underwriting of any bonds of the Derby Oil Company were rendered by the plaintiff as an employee of Mr. A. L. Derby and Dan F. Callahan and the Derby Oil Company under an arrangement heretofore alleged, and that all of such services have been heretofore fully paid for to the plaintiff."

If there had been any evidence that plaintiff's acts were those of a mere volunteer, defendant might have asked for an instruction covering its nonliability thereunder. And it is needless to waste words rehashing the jury question whether Mitchell was merely an employe of Derby at a stipend of a couple of hundred dollars per month. The court covered that feature of the case with a compre-

hensive instruction to which no exception was taken, and the jury's pertinent findings read:

"11. Was F. H. Mitchell employed and received compensation from A. L. Derby to render such service to him and to the Derby Oil Company as A. L. Derby might request?  A. No. . . .

"25. Were not the sums of money received by plaintiff Mitchell in the months of August, September and October, 1921, from A. L. Derby, advancements made in connection with the attempted sale of stock of the Derby Oil Company belonging to Mr. A. L. Derby and Mr. Dan Callahan personally, and were not such sums charged to the account of Derby & Callahan?  A. No, to advancements; yes, to charge of Derby & Callahan.

"26. Was any sum of money paid plaintiff Mitchell, either as salary or advancement, by the Derby Oil Company itself?  A. No."

Defendant's counsel next proceed with a dissertation on the essentials of an implied contract to pay for services. This is an interesting theme, to be sure, but unless some error of the trial court in its instructions or in its application of this phase of the law is disclosed, we cannot presently pursue it with profit. The pertinent law, with which the criticized instruction was in substantial accord, is given our own precedents.

In *Wilson v. Haun,* 97 Kan. 445, 155 Pac. 798, it was held:

"To establish the relation of agency an express appointment and an acceptance thereof is not essential, but it may be implied from other facts, such as the statements of the parties, their conduct and the relevant circumstances." (Syl. ¶ 1.)

In *Investment Co. v. Lowrey,* 99 Kan. 87, 160 Pac. 999, it was decided:

"A letter from a brokerage company to a banker, saying that it would be glad to give its best efforts to assist him in making a sale of his stock, and a reply stating that if satisfactory to other holders he might sell at a price named, are to be interpreted as an offer by the company of its services, in the expectation of receiving compensation therefor if successful, and as a qualified acceptance by the banker amounting to an invitation to the company to produce a customer, with the understanding that it was to receive a commission if a sale should be brought about by its efforts." (Syl.)

See, also, *Stephens v. Scott,* 43 Kan. 285, 23 Pac. 555; *Johnson v. Huber,* 80 Kan. 591, 103 Pac. 99; *Williams v. Jones,* 105 Kan. 282, 182 Pac. 391; *Simmons v. Oatman,* 110 Kan. 44, 202 Pac. 977; 40 Cyc. 2808 *et seq.;* 13 C. J. 241; 6 R. C. L. 587, *et seq.*

Counsel for defendant say:

"In order to hold the Derby Oil Company under the circumstances of this case, the law must in effect say that Mr. Derby, as president of the Derby

Oil Company, when he received the telegram from Mr. Mitchell, and when he further took up with Wilsey & Company the matter of their underwriting these bonds, as a reasonably prudent man, would be required to know that on account of such services Mr. Mitchell expected, and the Derby Oil Company would be required to pay him, the reasonable value of the services, the amount of which the jury found to be $8,000."

There can be no quarrel with this line of argument, and we are bound to hold that all the circumstances outlined by counsel were fully met. Derby, president of the oil company, knew that Mitchell had broached to him the idea of a million-dollar bond issue and was eager to find an underwriter to float the bond issue, knew Mitchell had been working zealously for some time to interest Wilsey & Company and other underwriters in the issue, knew what were Mitchell's usual terms for his brokerage services—Derby & Callahan were to pay him two per cent to sell their half million dollars' worth of stock—knew that the Wichita Trust Company had formerly had an arrangement with him at the same rate of commission, knew that Mitchell owed $40,000 to Callahan's bank in Wichita, and knew that Mitchell was financially hard up and that he had no way to pay his debts except by the successful prosecution of his business as a broker, and knew that he, Derby, president, had already assured Mitchell at least twice during that autumn that Mitchell would be paid what was right for finding an underwriter, and knew that there was not the slightest reason for supposing that Mitchell's need and expectation of pay was any less for services rendered after September 8 than before that date.

Error is also assigned on this instruction:

"You are instructed that even though you find that the contract of underwriting or purchase was in part optional, yet if you find that such option was exercised by Wilsey & Company, then the plaintiff is entitled to recover for a fair and reasonable value of his services with relation to such bonds so taken or purchased by Wilsey & Company under the exercise of such option, if you find that he was the procuring cause and was employed by the Derby Oil Company to find some one to underwrite the bonds issued by that company as herein elsewhere instructed.

"If any underwriting contract made between Wilsey & Company and the Derby Oil Company was in part optional, then if that option was exercised by Wilsey & Company, the optional part of the contract became a binding contract."

This was not an incorrect statement of law. While the mere procuring of an optionee does not entitle a broker to his commission, yet if the option is actually exercised, or if some act or fault of the

Mitchell v. Derby Oil Co.

broker's principal alone prevents its exercise by the optionee, the broker is entitled to his commission. In 4 R. C. L. it is said:

"It is a matter of common knowledge that sales are frequently effected through options. By granting the option the owner is merely helping to bring about the sale which he employed the broker to make. It is a step in that direction. . . . While, as above shown, according to the great weight of authority the mere procuring of one to take an option does not entitle the broker to commissions if the optionee elects not to exercise the same, yet it is apparently well settled that the broker is entitled to his commission if the option is actually exercised, or the optionee is willing to exercise it but is prevented from so doing by the refusal of the owner to comply with his part of the agreement." (p. 315. See, also, notes to reported cases in 43 L. R. A., n. s., 91, 94; 23 A. L. R. 856, 859-60; 9 C. J. 603-605.)

Defendant's twenty-second assignment of error is based upon the trial court's refusal to give an instruction which in any event would have limited plaintiff's recovery to a reasonable commission on the first $100,000 worth of bonds which Wilsey & Company agreed to underwrite in their offer of October 12, and would have told the jury that no commission was due on that part of the issue as to which Wilsey & Company had only bargained for an option or series of options. Such an instruction would have been a very incomplete and misleading statement of the law as applied to this case, as we have shown above.

Defendant also complains of this instruction given by the court:

"You are instructed that any contracts or agreements entered into between Wilsey & Company and the defendant, the Derby Oil Company, cannot limit the amount of recovery of the plaintiff in this action. If you find from the evidence that the plaintiff was employed to find an underwriter for the bonds of the Derby Oil Company, that he was the procuring cause of the underwriting of a million dollars par value of such bonds; and if you further find that it was not a part of the plaintiff's employment by A. L. Derby to procure an underwriter of the bonds for which he was paid by A. L. Derby, then the plaintiff may recover the fair and reasonable value of his services in procuring such underwriting."

That seems to be a fair statement of the law. If Mitchell had a contract with defendant, express or implied, to procure an underwriter for defendant's million-dollar bond issue and was the initiator and procuring cause of obtaining Wilsey & Company as underwriter for the million-dollar bond issue, certainly plaintiff would be entitled to his commission, and of course the details of the bargain between the underwriter and defendant, whether written or oral, or partly written and partly oral, or made for part of the issue at one

time and for optional and additional parts of the issue at another time or at intervals, or whether Wilsey & Company underwrote part of the issue without any express contract pertaining thereto—neither of these facts nor all of them together would limit the amount of plaintiff's compensation. Once plaintiff's employment was established and the fact established that he was the procuring cause of whatever contract or contracts, express or implied, were made and performed between defendant and Wilsey & Company for the disposal of this bond issue, plaintiff's right and defendant's liability became absolute—a reasonable commission on defendant's bond issue underwritten by Wilsey & Company.

In *Dreisback v. Rollins,* 39 Kan. 268, 18 Pac. 187, it was held:

"1. A broker employed to sell lands or to find a purchaser for them, who brings and introduces a buyer to the owner and starts negotiations between them which result in a sale, is entitled to his commission, although he is not present during the negotiations and until the completion of the sale. . . .

"2. . . . When the sale is consummated with such purchaser, at the price asked and upon terms satisfactory to the owner, the broker has discharged the obligation of his contract and has earned his commission." (Syl. See, also, *Grimes v. Emery,* 94 Kan. 701, and citations, 146 Pac. 1135; *Ryan v. Strong,* 111 Kan. 54, 206 Pac. 322; *Briggs v. Bank,* 112 Kan. 161, 210 Pac. 480; *Freeman v. Kingston Mfg. Co.,* 233 Fed. 58; 9 C. J. 611, *et seq.*)

In *Marlatt v. Elliott,* 69 Kan, 477, 77 Pac. 104, it was held:

"1. It is sufficient to entitle a real-estate agent to recover his commission for the sale of land that he, under a contract with the owner thereof, has been the procuring cause of such sale. He need not have conducted it to a final and successful conclusion.

"2. If a real-estate agent, under a contract with the owner, call the attention of a prospective buyer to the land of such owner, and thereafter, moved by the efforts of such agent, the proposing buyer and the owner consummate the purchase and sale of such real estate, the agent is entitled to his commission, even though the purchaser, at the time the agent solicited him to buy, was not ready, willing and able to purchase." (Syl.)

A diligent and oft-repeated perusal of this entire record, including the files of the trial court and the transcript, discloses no error of which defendant can justly complain.

Turning next to plaintiff's grievance under his cross-appeal, he urges our attention to the uncontradicted evidence touching the value of his services, to the admissions by defendant's counsel as to the purport of the jury's award in their general verdict, and to the jury's special findings, and contends that he is entitled to have judgment ordered by this court as prayed for in his petition.

It cannot be doubted that since the revision of the code in 1909

(§ 581, R. S. 60-3317), this court has power, in any proper case pending before it, to—

"Render such final judgment as it deems that justice requires, or direct such judgment to be rendered by the court from which the appeal was taken." (*Ratliff v. Railroad Co.*, 86 Kan. 938, 940, 122 Pac. 1023.)

And this broadened appellate power has frequently been exercised. In *Manufacturing Co. v. Porter*, 103 Kan. 84, 172 Pac. 1018, the action was to recover the price of machinery for an elevator. The defense, which prevailed below, was based upon the controverted question whether the elevator company was liable as guarantor of the contractor who built the elevator because of an obligation to that effect signed by its secretary. In reversing the judgment this court said:

"Does this conclusion leave anything on which to base a new trial, or should judgment be ordered? The defense of want of authority on the part of the secretary to apprise the plaintiff that the association would guarantee the payment failed. . . . And the record shows that in no way can the defendant rightfully prevail; and since all the material facts are incontrovertibly established, a new trial would confer no favor on the defendant, but only prolong litigation over a liability which defendant cannot escape, and judgment for plaintiff should be directed. (Civ. Code, § 581.)" (pp. 88, 89.)

Under authority of this code provision, judgments for defendants on jury verdicts have been reversed and money judgments for plaintiffs directed by this court. (*Bank v. City of Rosedale*, 108 Kan. 474, syl. ¶ 2, 196 Pac. 770.) Judgments for defendants on jury verdicts in ejectment actions have been reversed and judgments decreeing possession to plaintiffs have been ordered (*Charpie v. Stout*, 88 Kan. 318, 128 Pac. 396; id. 682, 129 Pac. 1166), and nothing is more common than directed judgments of this court *non obstante veredicto* in actions on promissory notes (*State Bank v. Grennan*, 116 Kan. 442, 227 Pac. 530), in actions for damages (*Martin v. City of Columbus*, 96 Kan. 803, 153 Pac. 518; *Tacha v. Railway Co.*, 97 Kan. 571, 155 Pac. 922), in actions on wills (*Wisner v. Chandler*, 95 Kan. 36, 147 Pac. 849), where special findings of the trial court or jury clearly demonstrated that justice so required. See, also, *City of Washington v. Investment Co.*, 117 Kan. 15, 230 Pac. 311.

The evidence was that the fair and reasonable value of the service of procuring an underwriter for a million-dollar bond issue of a concern like defendant company was two and one-half to five per cent of the par value of the bonds. Two experienced witnesses so

testified. There was no testimony to the contrary. Plaintiff asked for two per cent, and the court instructed the jury not-to allow any award to plaintiff on any basis in excess of 2 per cent. There is neither contention nor pretense in this lawsuit that plaintiff's commission, if he was entitled to recover, should have been determined on any other basis than two per cent. Counsel for defendant concede in their brief that the verdict which the jury did return was based upon a two per cent computation on the first $400,000 of the bond issue underwritten by Wilsey & Company, plus interest on such computed amount. The pertinent special findings of the jury read:

"7. State what F. H. Mitchell did toward inducing Wilsey & Company to underwrite the bonds of the Derby Oil Company after September 8, 1921. A. By bringing parties interested together through personal visits and telegrams. . . .

"14. Did the Derby Oil Company make with F. H. Mitchell or R. E. Wilsey & Company a contract that it would issue more than $400,000 of bonds at or prior to the time that the bonds and mortgage were executed? A. Yes. ·. . .

"17. Did the plaintiff Mitchell, by letter. or otherwise, first call the attention of Wilsey & Company to the fact that the Derby Oil Company wished to put out a million-dollar bond issue? A. Yes.

"18. Did the plaintiff Mitchell, by letter or otherwise, first call attention of the officers of the Derby Oil Company to the fact that Wilsey & Company were interested in underwriting or purchasing a million-dollar issue of the bonds of the Derby Oil Company? A. Yes.

"19. Did plaintiff Mitchell, after all prior negotiations had ended, again take up with Wilsey & Company the matter of underwriting or purchasing a million-dollar bond issue of the Derby Oil Company? A. Yes.

"20. Did plaintiff Mitchell, after all prior negotiations had ended, again take up with A. L. Derby, as president of the Derby Oil Company, the matter of securing Wilsey & Company to underwrite or purchase a million-dollar bond issue of the Derby Oil Company? A. Yes.

"21. In Chicago, about October 4, 1921, did plaintiff Mitchell take Mr. A. L. Derby, the president of the Derby Oil Company, to the office of R. E. Wilsey & Company, to begin negotiations for the issuance of the Derby Oil Company and the underwriting and purchase by Wilsey & Company of one million dollars of the bonds of the Derby Oil Company, or any part thereof? A. Yes.

"22. Did members of the firm of Wilsey & Company come to Wichita as a result of the negotiations begun in Wilsey & Company's office on or about October 4, 1921, and make a contract with the Derby Oil Company to underwrite or purchase bonds of the Derby Oil Company? A. Yes.

"23. Did not the Derby Oil Company authorize the issuance of one million dollars of its bonds in December, 1921, pursuant to the suggestion and recommendation of Wilsey & Company? A. Yes.

"24. How many bonds did F. H. Mitchell procure Wilsey & Company to purchase from the Derby Oil Company?  A.  $1,000,000."

Defendant endeavors to combat the proposition raised by the cross-appeal by directing special attention to the jury's special findings 8 and 16, which read:

"8. Was the contract contained in the letter of Wilsey & Company of date of October 12, 1921, the only contract between Wilsey & Company and the Derby Oil Company for the underwriting of bonds up to the issuance of bonds in January, 1922?  A.  Yes. . . .

"16. Did F. H. Mitchell participate in any negotiations between the Derby Oil Company and R. E. Wilsey & Company after his return from Chicago, about October 7, 1921?  A.  No."

What significance have these last quoted findings?  Merely that after October 12, 1921, when Wilsey & Company offered to underwrite $100,000 worth of the bond issue with successive options on $300,000 more, there were no further contractual relations between Wilsey & Company and defendant for about three months.  Why should there be?  It took about that length of time to get the bonds ready to be issued.  Question No. 8 virtually shows that and Derby's testimony was to the same effect.  It would have been curious if there had been any other contract during that short interval before the bonds were issued and before Wilsey had a chance to learn how defendant's bond issue would be received on the industrial bond market.  And when the process of underwriting and marketing the bond issue was once begun, so successfully did it proceed that not only the first $400,000 but the entire $1,000,000 was underwritten and disposed of without any further contract except such as the law would supply from the acts of the parties.  And as to finding No. 16, Mitchell had already done all it was necessary for him to do to earn his compensation (*Dreisback v. Rollins*, supra; *Marlatt v. Elliott*, supra), as shown by the other findings quoted above.  In defendant's brief the information is volunteered that Wilsey & Company "only purchased $900,000 of bonds; $100,000 of bonds were traded by the Derby Oil Company to Dan F. Callahan for properties obtained from him, and Mr. Callahan in turn had Wilsey & Company dispose of these bonds for him."  But apparently the testimony which the jury chose to believe was given by R. E. Wilsey, viz:

"Q. Mr. Wilsey, how many bonds has R. E. Wilsey & Company underwritten for the Derby Oil Company pursuant to their agreement to underwrite bonds? . . .  A.  We bought a total of a million dollars.

"Q. And how many of these bonds have been delivered to R. E. Wilsey &

Company by the Derby Oil Company? A. Practically all. There may be a few undelivered bonds.

"Q. Do you recall approximately when these bonds were delivered? A. The first four hundred thousand were delivered, I think, in February of 1922; and two or three hundred thousand—two hundred thousand, some time during the summer of 1922; and the remainder on or before December, 1922. I want to correct that. There may have been a few of them—I guess there were—a few of them delivered in January, 1923."

There was no motion to set aside the jury's finding No. 24, although defendant's attention must have been sharply drawn to it by plaintiff's motion for judgment *non obstante* on the special findings of the jury.

In view of the uncontroverted evidence touching the value of plaintiff's service and the admissions of counsel concerning the same, and the absence of any dispute as to the reasonable value of plaintiff's services, and the special findings quoted above, it seems clear that plaintiff's cross-appeal must be sustained; and as all controverted matters in this lawsuit are conclusively disposed of by the jury's verdict, and there is nothing remaining in dispute which would furnish a basis for a new trial, it follows that judgment should be ordered as the civil code, section 581, commands.

The judgment of the district court is therefore modified so far as necessary to give effect to the judgment of this court on plaintiff's cross-appeal, and the cause is remanded with instructions to enter judgment for plaintiff for the full amount prayed for in his amended petition.

MR. CHIEF JUSTICE JOHNSTON concurs in affirming the judgment of the trial court entered on the general verdict, but dissents as to the decision of this court on the cross-appeal.

HARVEY, J. (dissenting in part): I concur in affirming the appeal and dissent in sustaining the cross-appeal. This is an action on *quantum meruit,* not on contract. The contract between Wilsey & Company and defendant of October 12 provided for taking a maximum of $400,000 bonds. Plaintiff had nothing to do with the deal after that date; whether defendant sold any bonds to Wilsey & Company or to anyone else, and the amount sold, were things with which plaintiff had nothing to do. The jury, under all the evidence, allowed $8,426.66 for the reasonable value of the services performed. I think that was liberal. There is doubt in my mind if plaintiff was really entitled to recover anything. When he was

employed by the trust company to sell stock he had a contract for two per cent commission; for the sale of the bonds he had no contract. I think the relation between the parties was such that if plaintiff had expected pay on a commission basis for the sale of bonds, or if defendant had intended to pay on that basis, there would have been a contract as to what he was to receive. The whole suit bears the aspect of an afterthought. But the jury chose to believe plaintiff's version that there was an understanding that he was to be paid "what was right," as it had a right to do under the conflicting evidence. So that question is settled. But since the jury determined "what was right" in view of all the circumstances of the case, I would let that remain settled, too.

Mr. Justice Mason joins in this partial dissent.