[S. F. No. 16814.   In Bank.   May 22, 1944.]

J. A. ZINN et al., Appellants, v. EX-CELL-O CORPORA-
TION (a Corporation) et al., Respondents.

Livingston & Livingston, David Livingston and Louis F. Di Resta for Appellants.

Webb, Webb and Olds, U. S. Webb and Walter K. Olds for Respondents.

THE COURT.—Plaintiffs instituted an action for rescission or damages based on the alleged fraudulent procurement

of the termination of an agency contract and the sale by them to defendant Ex-Cello-O Corporation (hereinafter referred to as Ex-Cell-O) of shares of capital stock of Sealed-Pure Systems, Inc., (hereinafter referred to as Sealed-Pure). Judgment in the trial court was in favor of the defendants. The plaintiffs appealed. ·

The question presented is whether the findings of the trial court are supported by the evidence and furnish support for the judgment.

On October 30, 1937, plaintiff Zinn and his associates procured from Ex-Cell-O, a manufacturer of machines designed to make cardboard milk containers, an exclusive agency contract, which provided that within ninety days plaintiffs should place three machines, and within six months they should place one machine in Seattle, one in either Oakland or San Francisco, and one in Los Angeles, all under lease-royalty contracts with the manufacturer. Plaintiff and his associates then incorporated Sealed-Pure, with a capital stock of 10,000 shares of no par value, and, with the consent of Ex-Cell-O, assigned to it the agency contract in return for stock. The defendant Malkson received stock in return for cash. One machine was immediately placed with Gold Star Creameries (hereinafter referred to as Gold Star), a corporation in which Zinn and his associates were stockholders. This is conceded to have been a substantial compliance with the requirement that a machine be placed in Seattle, but no other machines were placed within the ninety-day or six-month periods. Gold Star had financial difficulties, and Sealed-Pure, apparently with the acquiescence of Ex-Cell-O, lent considerable money to Gold Star in the belief that it would be fatal to the prospect of placing other machines in the Pacific Coast territory if the first one installed there should be a failure. As a result of these loans Sealed-Pure also encountered financial difficulties, and discord arose among its promoters.

In February, 1938, the sales manager of Ex-Cell-O went to Seattle and arranged that Sealed-Pure should open an office in San Francisco with defendant Malkson as general manager, and that Zinn should devote his attention exclusively to the business of Gold Star. From the time the arrangement was made, Malkson had charge of Sealed-Pure's activities. Gold Star continued to operate at a loss and was unable to pay the moneys due Sealed-Pure. As a result, Malkson was short

of funds and Ex-Cell-O made advances to him on the security of the Gold Star notes.

During all of this time Ex-Cell-O took no steps to cancel the agency agreement. In January, 1938, it expressly agreed to an extension of the ninety-day period provided aggressive sales efforts were made. Zinn, and later Malkson, devoted much time in attempting to place machines with Lucerne Cream and Butter Company, a subsidiary of Safeway Stores, Inc. (hereinafter referred to as Safeway), which operated chain stores in the Pacific Coast territory. By July, 1938, these negotiations reached the point where Safeway requested that an officer of Ex-Cell-O come to San Francisco for the purpose of negotiating a contract. At the request of Malkson, defendant Bixby secretary-treasurer of Ex-Cell-O, went from Detroit to San Francisco, and on July 25th, he and Malkson obtained a contract with Safeway for the placing in Oakland of one machine on ninety days' trial, with an option to purchase it for $32,500, and additional machines at $37,500 each. As part of the same transaction they received a purchase order for the trial machine at $32,500.

While in San Francisco, Bixby told Malkson that Ex-Cell-O planned to cancel the Sealed-Pure agency contract. Malkson expressed his regret, but asked Bixby to engage him as Pacific Coast agent if that were done. Bixby proceeded to Seattle and three days after the Safeway contract was signed, on July 28th, met Zinn and his associates. Bixby told them that Sealed-Pure had failed to place any machines in California as required by the agency contract, and that Ex-Cell-O was going to abolish the agency, in which event the Sealed-Pure stock would be valueless. Zinn and his associates first demurred to the proposed cancellation and made unsuccessful attempts to raise additional funds. They then negotiated with Bixby for the sale of their Sealed-Pure stock to Ex-Cell-O, and Bixby told them he would try to get one dollar a share for them. Zinn then said to Bixby in the presence of others, "How do I know you haven't already got an order in your pocket or have made some deal we don't know anything about?" Bixby replied, "If I had an order in my pocket or had made any deal I would tell you about it." Bixby denied that this conversation took place but he did not reveal that an agreement had theretofore been made with Safeway for the installation of one machine and for an option to purchase others.

On August 1st Ex-Cell-O wrote Sealed-Pure cancelling the agency agreement, and negotiations were entered into for the sale of the Sealed-Pure stock to Ex-Cell-O. These negotiations were completed, and the transfer of the stock was made on August 30th. Subsequently Sealed-Pure was dissolved by Ex-Cell-O, and Ex-Cell-O appointed Malkson its Pacific Coast agent. Within a short time Safeway bought six machines. It may not be questioned that these machines had been placed through the efforts of Malkson on behalf of Sealed-Pure.

When Zinn learned of the Safeway installation at the end of August, 1938, he took no action. The testimony disclosed that, relying on Bixby's representations, the plaintiffs believed that the installation was made pursuant to an arrangement effected by Ex-Cell-O after the Sealed-Pure agency agreement was cancelled, and it was not until January, 1939, when Zinn learned that a large quantity of cardboard for milk bottles had been ordered by Safeway on August 1, 1938, that he suspected for the first time that a machine had already been placed by Sealed-Pure when Bixby's representations were made. He immediately instituted an investigation. This action was then brought to rescind the sale to Ex-Cell-O of Sealed-Pure stock, or for damages. Rescission being impossible by reason of the dissolution of Sealed-Pure, the plaintiffs abandoned that claim and sought damages only.

The trial court found that Bixby made the representations alleged, that the same were false, and that plaintiffs believed and relied upon them; but further found that even had plaintiffs known that the representations were false they would not have rejected defendants' offer to purchase their stock at the price paid. The court also found that Sealed-Pure was in default under its contract with Ex-Cell-O; that Ex-Cell-O had a right to declare the contract forfeited; that plaintiffs were entitled to notice of the intended termination and cancellation and to a reasonable time within which to comply with the terms and conditions before a forfeiture thereof could be declared, but that plaintiffs waived their right to notice and to time within which to comply with the contract; that both plaintiffs and defendants acquiesced in the cancellation of the contract by Ex-Cell-O.

The evidence is insufficient to support the finding that plaintiffs would have sold their stock at the price paid for

it if they had known that their efforts had been rewarded by the contract with Safeway.

Both the evidence and the findings are clear to the effect that the false representation was believed and relied upon by the plaintiffs. This court has held that "a single material misstatement, knowingly made with intent to influence another into entering into a contract, will, if believed and relied on by that other, afford as complete a ground for rescission as if it had been accompanied by a multitude of other false representations." (*Davis* v. *Butler*, 154 Cal. 623 [98 P. 1047]; see, also, 12 Cal.Jur. 741, and cases there cited.)

The defendants seek to impute Malkson's knowledge as an officer of Sealed-Pure to the plaintiffs. That knowledge may not be so imputed. There is no privity between the officers and stockholders of a corporation which would impute the knowledge of one to another in his individual capacity. (*Pitman* v. *Walker*, 187 Cal. 667, 670 [203 P. 739].)

The court's further finding that the effect of the cancellation of the agency contract was to render the stock of Sealed-Pure valueless is also without substantial support in the evidence. The evidence shows value, and the trial court recognized value and the falsity of Bixby's representation as to lack of value by its finding that at the time the representation was made by Bixby, Sealed-Pure had prospects for the placing of certain of the machines, which, if contracts therefor were placed within a reasonable time, would give the stock of Sealed-Pure "a value of $100,000 or more as alleged by plaintiffs."

The agency contract called for a 12½ per cent commission to Sealed-Pure of all rental payments received by Ex-Cell-O, but Ex-Cell-O reserved the right to adopt other methods of placing the machines than by lease-royalty, and in the case of the contract with Safeway it exercised that right. Under those circumstances some commission would be payable to Sealed-Pure on the purchase price, and the 12½ per cent commission fixed in the contract as commission on lease-royalty agreements would at least prima facie establish the rate of commission to be paid in case of sales.

It is apparent that when Sealed-Pure brought about the execution of the contract with Safeway it had done all that was required by the agency contract as modified, to entitle it to receive commissions if thereafter Safeway elected to pur-

chase one or more machines pursuant thereto. The applicable rule is stated in 12 C.J.S. 200: "Although the broker has obtained only an option, he is entitled to a commission when the customer exercises the option, within the life thereof, by entering into the transaction which the broker was employed to negotiate." To the same effect are: *Dinkelspiel* v. *Nason,* 17 Cal.App. 591 [120 P. 789]; *Mitchell* v. *Derby Oil Co.,* 117 Kan. 520 [232 P. 224]; *Finnerty* v. *Stratton's Estate,* 53 Colo. 17 [123 P. 667]; *Snead* v. *Wood,* 24 Ga.App. 210 [100 S.E. 714]; *Mahoney* v. *Pitman* (Tex.Civ.App.), 43 S.W.2d 143; *Campbell* v. *Rawlings,* 280 F. 1011 [52 App.D.C. 37]; 8 Am. Jur. 1094.

█ Having fully performed the service which would entitle Sealed-Pure to commissions upon sales subsequently made under the trial-option agreement, the only question remaining is the effect of the termination of the agency contract upon the agent's right to commissions.

The applicable rule with supporting authorities is stated in 3 C.J.S. 88: "The rule that the agent is entitled to recover for services rendered before his discharge is particularly applicable where the contract of agency is severable. Accordingly, an agent selling goods on commission is entitled to a commission on goods sold by him during the continuance of the agency, although the goods were not delivered or paid for, or even where the orders were not received by the principal, until after the termination of the relationship. If the contract contemplates that the agent shall receive compensation for sales of which the agent was the procuring cause, the agent is entitled to a commission on sales procured by him although the sales were actually consummated by the principal after the termination of the agency," and at page 91 of the same volume: "Where the services to be performed by the agent are severable, he may, in the absence of a contrary provision in the agency contract, recover for services performed before the termination of the relationship."

The rule is applied in cases involving similar situations. (*Brea* v. *McGlashan,* 3 Cal.App. 2d 454 [39 P.2d 877]; *Sackett* v. *Centaur Motor Co.,* 189 Ill.App. 372; *S. H. Greene & Sons* v. *Freund,* 150 F. 721 [80 C.C.A. 387]; *White Co.* v. *W. P. Farley & Co.,* 219 Ky. 66 [292 S.W. 472, 52 A.L.R. 541]; *Crosby* v. *Pacific S. S. Lines,* 133 F.2d 470.)

In *Sackett* v. *Centaur Motor Co., supra,* plaintiff had an

agency for the sale of automobiles on a commission "of the gross sales emanating" through his office. He was discharged and claimed commissions on automobiles sold on orders given after his discharge pursuant to what amounted to options arranged by him before discharge. The court said at page 375: "If the alleged contracts were nothing more than arrangements, when an arrangement with a prospective purchaser ripens into a sale, it gives a right to the agent to a commission for the reason that the agent's efforts are the efficient cause of the sale."

The rule exists for the protection of the agent and is applicable to the undisputed facts of this case. Sealed-Pure "obtained" Safeway as a buyer pursuant to the contract brought about by it, and was entitled to the commissions on such sales despite the termination of its agency. For this reason the termination of the agency contract did not render the stock of Sealed-Pure valueless as found by the trial court.

■ The evidence and the findings settle the plaintiffs' right to a recovery of the difference in the value of the stock by reason of the prospective sales brought about by the efforts of Bixby and Malkson on behalf of Sealed-Pure, and the amount which the plaintiffs actually received for their stock. Section 3343 of the Civil Code provides that one defrauded in the sale of property is entitled to recover the difference between the actual value of that with which he parted and the actual value of that which he received. The value of the stock is to be determined by the worth of the corporate assets, not the "market value" of the stock. (Note in 57 A.L.R. 1153, and cases therein collected.) ■ Future profits may be shown for the light that they throw on the value of the stock at the time of its fraudulent purchase. (*Hacker Pipe & S. Co.* v. *Chapman Valve Mfg. Co.*, 17 Cal.App.2d 265, 271 [61 P.2d 944]; *Wakeman* v. *Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205 [4 N.E. 264, 54 Am.St.Rep. 676].) In *Sinclair Ref. Co.* v. *Jenkins etc. Co.*, 289 U.S. 689 [53 S.Ct. 736, 77 L.Ed. 1449], the Supreme Court stated: "To correct uncertain prophecies in such circumstances is not to charge the offender with elements of value non-existent at the time of his offense. It is to bring out and expose to the light the elements of value that were there from the beginning." ■ One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could

298

not be measured with exactness. (*Pacific etc. Co.* v. *Alaska Packers' Assn.,* 138 Cal. 632, 638 [72 P. 161]; 15 Am.Jur. 412, and cases cited.)

The plaintiffs in any event are entitled to recover on the showing that subsequent sales to Safeway were made as a result of the efforts of Sealed-Pure under the cancelled contract and those sales should be taken into consideration in computing the value of the stock sold. Whether by reason of the termination of the agency contract Sealed-Pure was entitled to recover against Ex-Cell-O for wrongful repudiation of the agency contract is a matter bearing upon any possible additional damages.

The record shows that Malkson was not a party to the false representations. The judgment as to that defendant is therefore affirmed. As to the defendants Ex-Cell-O Corporation and Bixby the judgment is reversed.

Respondents' petition for a rehearing was denied June 19, 1944.