[Civ. No. 23732. Second Dist., Div. Three. Jan. 27, 1960.]

F. C. TOMLINSON, Respondent, v. WANDER SEED AND BULB COMPANY (a Corporation) et al., Appellants.

Edward M. Raskin and Gerald E. Lichtig for Appellants.

Donald E. Feeley for Respondent.

VALLÉE, J.—Appeal by defendants from a judgment for plaintiff in an action for damages for breach of a contract to deliver dichondra seed.

The contract on which the action was based provided for the sale of 2,000 pounds of dichondra seed by defendants, wholesalers of seeds and bulbs, to plaintiff, operator of a nursery, at a total price of $8,000. Defendants delivered only 744 pounds. They contend that under the terms of the contract they were excused from delivering the balance of the seed and, in any event, the awards of lost profits and of interest were improper.

Viewing the evidence in the light most favorable to plaintiff, it appears that about July 1, 1954, defendant Wander, then president and owner of over 80 per cent of the stock of defendant corporation and at time of trial the sole owner, called on plaintiff and represented to him that dichondra seed was in short supply and that he had control of the only seed available. He told plaintiff he had the seed on hand and it would be available to plaintiff after tests had been made and the seed tagged to show the percentage of germination by the state. Plaintiff agreed to purchase 2,000 pounds of seed at $4.00 a pound and to pay $4,000 in advance on the first thousand pounds and $500 in advance on the second thousand pounds. He offered to have the seed insured but Wander told him he had insured it. Plaintiff asked Wander to let him have some of the seed allocated to another customer of defendants while the tests were being made but Wander refused, stating that each customer's stock was set aside specifically for him.

On July 2, 1954, plaintiff received the first shipment of seed, 24 pounds. On July 6, 1954, Wander presented to plaintiff a printed form which displayed the letterhead of Wander Seed and Bulb Company and was titled "Acknowledgment of Order." Plaintiff's business name and address had been typewritten opposite the printed words "sold to." The body of the form contained the following typewritten matter:

"2000 lbs Dichondra Seed $8,000

"1000 lbs Dichondra Seed to be taken in, completely by October, or sooner (depending on the request for delivery by Mr. Tomlinson) and $4,000 for said seed to be paid immediately. The balance of the 1000 lbs. will be held in our

warehouse until such time that Mr. Tomlinson requests delivery. Deposit of $500.00 on same.

"Paid to date: $4500.00.

"Balance of $3500.00 to be paid as the second 1000 lbs. of seed is picked up."

The following paragraph printed in small type appeared on the face of the printed form immediately above the typewritten matter:

"We guarantee all stock true to name and sound when shipped by us. In keeping with trade custom and, as we exercise no control over conditions under which stock is stored or planted by the purchaser, we will not be responsible for the results obtained. All quotations are subject to crop and other conditions beyond our control."

At that time plaintiff delivered his check for $4,500 to Wander and both parties signed the completed form, Wander signing in the name of the Wander Seed Company. Plaintiff did not "pay any attention to" or read the printed provision referring to "quotations" when he signed the agreement because "it didn't enter into it. We didn't care about the crop. This was seed on hand I was buying. I wasn't going to giving him money to raise it."

Subsequently plaintiff received four additional shipments of varying amounts after he had made numerous requests for delivery. On October 11, 1954, plaintiff's secretary requested further delivery of seed from Wander and made a written memorandum on the reverse side of the "Acknowledgment of Order" stating, "Mr. Wander said see[d] has to dry out Maybe Wed." On October 24 plaintiff made a formal demand for the balance of the seed and on October 29 he received a shipment which brought the total he received to 744 pounds. Defendants had no seed and made no further deliveries.

Wander testified: he told plaintiff at the time negotiations were being carried on between them that he had a commitment from a grower for seed from the California crop which was then being harvested; he did not tell him the name of the grower; he told him that if he would make an advance payment of $4,500 he would sell 2,000 pounds for delivery as it was harvested, tested, and processed; the contract was made in contemplation of this specific source of seed.

Wander further testified he had advanced to Alice Harbaugh, the grower to whom he had referred, a total of $9,000 over a period of time pursuant to contractual arrangements

he had with her. He was not her employer and he had no title to any of her seed. She had accepted his money and had obtained seed from other growers but had not delivered the seed to him nor paid the growers for the seed. He filed an action against her for money due, and caused an attachment to be levied on October 14, 1954, on 1,900 pounds of seed in her possession.

On November 22, 1954, Alice Harbaugh filed a petition in bankruptcy and some time later the seed was awarded to the unpaid growers who had filed claims. Defendants made no effort to obtain seed from other sources. Wander testified that seed was still available on the market and that other growers "had dichondra seed to sell" but that he made no attempt to purchase from them because until March 1955 he had hoped to obtain the seed held under the bankruptcy proceedings, after that he intended to replace the seed ordered by plaintiff with seed from an Arizona grower which would be ready in May 1955, and he would not buy seed from some place else in any case because it would have caused friction with his grower in Arizona.

Plaintiff was able to purchase 73.1 pounds of seed in small quantities at $8.00 a pound on the open market during November and December, 1954, but was unsuccessful in obtaining more until August, 1955. His nursery had been established in 1930 and the area in which it was located was in the midst of a building boom. He readily resold all of the seed he had obtained. He sold the 744 pounds obtained from defendants at $1.98 for a quarter pound package, and the 73.1 pounds obtained from other sources at $3.98 for a quarter pound.

The court found: the agreement was a contract for the sale of specific goods already in existence; defendants' failure to supply the balance of the seed was not due to crop failure or other condition beyond their control; the agreement was not conditional upon the phrase in the printed portion of the form which states, "All quotations are subject to crop and other conditions beyond our control"; the seed which was the subject matter of the agreement represented plaintiff's business needs for the year following its date; plaintiff had paid in advance for a large portion of the order so as to assure an ample supply of seed for his needs; he had placed advertising and had accepted orders for the seed in reliance on the agreement, and had been required to attempt

to buy seed on the open market in order to fulfill these obligations and the needs of his business; plaintiff had been unable to purchase the balance of 1,256 pounds of seed except the 73.1 pounds which he purchased at $8.00 a pound; plaintiff suffered damage of $4.00 a pound on his purchase of 73.1 pounds ($292.40) and damage of $7,000 for loss of profits on the remaining undelivered balance of 1,182.9 pounds; defendants were entitled to a setoff in the amount of $383.25 for moneys due for other goods sold and delivered to plaintiff.

The conclusions were that plaintiff was entitled to $8,433.10 damages, consisting of: $1,140.70 (the amount stipulated by the parties to be due plaintiff for advancements for which no seed was delivered, less the setoff due defendants); $292.40 (the excess amount which plaintiff paid to other sources for 73.1 pounds of seed); and $7,000 (loss of profits on the seed which was never obtained by plaintiff); plus interest on the $8,433.10 at 7 per cent per annum from November 1, 1954. Judgment was rendered accordingly.

Defendants' first assignment of error is that the findings are unsupported by and contrary to the evidence in that it was established: (1) the contract was made by both parties in contemplation of defendants' obtaining the seed from Alice Harbaugh; (2) the contract was made expressly subject to the phrase, "All quotations are subject to crop and other conditions beyond our control"; (3) and defendants were unable to procure the seed from this contemplated source because of supervening events beyond their control and thus were excused from further performance.

Defendants urge that the typewritten phrase, "Seed to be taken in, completely by October" could only be interpreted to mean that Wander was to "take in" the seed from Alice Harbaugh and in view of that, "it is more conceivable that the seed was not yet completely harvested, and therefore was still subject to crop failure." They argue that the evidence showed plaintiff knew the seed was to come from only that source by the fact that plaintiff asked Wander to let him have some of the seed allocated to another customer.

There is no merit in defendants' contention that the evidence established an implied condition, known and understood by plaintiff, that the source of seed was limited to that being produced by Alice Harbaugh. The document signed by the parties makes no reference to Alice Harbaugh as the source of the seed. Plaintiff and a witness who overheard the nego-

tiations between plaintiff and Wander both testified Wander stated he had the seed on hand awaiting only testing by the State to determine the percentage of germination. An invoice covering 1,000 pounds of seed from defendant to plaintiff under date of July 6, 1954, indicated that a total of 228 pounds of seed had been shipped to plaintiff as of that date. It contained the notation, "Balance when called for." Plaintiff testified he offered to insure the seed but that Wander stated he had taken care of it. Plaintiff paid over half of the total contract price in advance. There was testimony that plaintiff was a preferred credit risk, and that there was a shortage of seed. The notation on the back of the printed form quoting Wander's reply to plaintiff's request for delivery, "see[d] has to dry out Maybe Wed.," indicated that as late as October 11, 1954, defendants led plaintiff to believe they had the seed on hand.

■ " 'When the meaning of the language of a contract is uncertain or doubtful and parol evidence is introduced in aid of its interpretation, *the question of its meaning is one of fact.*' " (*Walsh* v. *Walsh,* 18 Cal.2d 439, 444 [116 P.2d 62].) "The rule is that an 'appellate court will accept or adhere to the interpretation [of a contract] adopted by the trial court— and not substitute another of its own— . . . where parol evidence was introduced in aid of its interpretation, and such evidence . . . is such that conflicting inferences may be drawn therefrom.' " (*Estate of Rule,* 25 Cal.2d 1, 11 [152 P. 2d 1003, 155 A.L.R. 1319].)

■ ■ If a seller agrees to deliver merchandise, his failure to effect delivery is not excused by the fact that he was unable to secure the commodity from an anticipated source. To constitute such inability a matter of defense, he must show that, in the contemplation of both parties, the merchandise was to be procured from the source in question (*S. L. Jones & Co.* v. *Bond,* 191 Cal. 551, 555 [217 P. 725]) ; and a reviewing court will not disturb the trial court's determination, sustained by substantial evidence, of whether the seller's duty to deliver material under a contract of sale was conditioned on ability to secure the material from a named source. (*Beatty* v. *Oakland Sheet Metal etc. Co.,* 111 Cal.App.2d 53, 65 [244 P.2d 25].)

The trial court, after hearing evidence of the facts and circumstances surrounding execution of the contract, found that the agreement was ·a contract for the sale of specific seed already in existence and on hand, and, in effect, construed the

phrase ''Seed to be taken in'' to mean the seed was to be taken into plaintiff's possession at the time stated in the agreement. The evidence supports the finding.

It is a reasonable conclusion based on inferences drawn from the evidence to which we have referred that plaintiff made the advance payment, and defendants indicated to plaintiff that they accepted it with the clear intention that plaintiff was purchasing specific seed on hand and would be protected from the uncertainty of obtaining seed as he needed it. The court reasonably found that delivery of the seed was not ''subject to crop.''

Defendants concede that if the contract was one for the sale of seed already in existence, the phrase ''subject to crop'' is without applicability. They urge, however, that there is no reason for disregarding the phrase which appears to make delivery contingent upon conditions beyond the control of the seller since that portion of the provision is not repugnant to the typewritten portions of the agreement.

The printed provision reads, ''All *quotations* are subject to crop and other conditions beyond our control.'' (Emphasis added.) Defendants say the word ''quotations'' is used, in its broadest sense, to mean all of the terms and conditions of the agreement, and that ''in the lay sense, the word could have no other connotation.'' We are not persuaded that parties in the position of plaintiff and defendants would use the word ''quotations'' interchangeably with the word ''contract'' or to mean the terms and conditions of a binding contract. The correct meaning of ''quotation'' in commercial usage is: ''The naming or publishing of the current price of stocks, bonds, or any commodity; also, the price named.'' (Webster's New Inter. Dict., p. 2046.) Applying this meaning to the word in the printed provision, the sentence informs a reader that the publishing of a current price for a commodity or the price named would be subject to change due to crop or other conditions beyond the control of the seller. This is not to say that the terms of a binding contract would be subject to such change, but only that the seller could change his quotation prior to his acceptance of an order. Stating an elementary rule of contract law, '' 'A quotation of prices is not an offer to sell in the sense that a complete contract will arise out of the mere acceptance of the rate offered or the giving of an order for merchandise in accordance with the proposed terms. It requires the acceptance by the one naming the price of the order so made to complete the transaction. Until thus com-

pleted there is no mutuality of obligation.' '' (*Buckberg* v. *Washburn-Crosby Co.*, 115 Mo.App. 701 [92 S.W. 733, 734].) In the usual commercial transaction, the giving of the order is considered to be the legal offer. A reasonable construction of the sentence restricts the application of the conditions stated to the time elapsing before the offer was accepted by the seller. Illustrative is *Lang & Gros Mfg. Co.* v. *Ft. Wayne C. Paper Co.*, 7 Cir., 278 F. 483, 487, where an offer for the sale of tape was made ''subject to market conditions remaining unchanged.'' The term referred to unchanged conditions at the time of the acceptance of the offer, and not to a change of conditions which might occur after the acceptance of the offer and before performance of the contract was completed. To construe the word ''quotations'' to mean ''contract'' would be to ignore the manifestations of intent of the parties as determined from the extrinsic evidence and the plain meaning of the word ''quotations,'' and to distort the contract of sale into a mere personal contract under which defendants would have no duty to deliver the seed at the agreed price if any outside factors interfered. Such a construction is unreasonable in view of the surrounding circumstances as determined by the court from the conflicting evidence.

Defendants insist that, by reading the typewritten words ''taken in'' to mean that the seed was to be taken in by defendants from Alice Harbaugh, effect would be given to the whole of the written document including the printed provision. This contention is based on reading the word ''quotations'' to mean ''contract.''

Inasmuch as the agreement was not made subject to the condition in the printed portion of the document which the parties signed, the finding that defendants' failure to supply the balance of the seed was not due to crop failure or other condition beyond their control is not material.

Defendants' second assignment of error is that the award of damages for loss of prospective profits was improper. Whether the measure of damages is determined by the application of section 1787 of the Civil Code where title to the goods has not passed to the buyer, or by sections 3300, 3354, and 3358 covering the measure of damages for the breach of any obligation arising from contract, the same measure would apply to the facts of the present case. In effect, sections 1787, subdivision (2), and 3300 apply the general rule of damages where there is not an available market for the goods which are

the subject of the contract. Section 1787, subdivision (2), reads:

"The measure of damages is the loss directly and naturally resulting in the ordinary course of events, from the seller's breach of contract."

Section 3300 reads:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

"Whether there was an available market, and whether, if there was not, a particular loss directly and naturally resulted in the ordinary course of events from defendants' breach, are questions of fact." (*House Grain Co.* v. *Finerman & Sons,* 116 Cal.App.2d 485, 496 [253 P.2d 1034].) The court found plaintiff was unable to purchase the balance of the undelivered seed except for 73.1 pounds. Defendants contend the evidence does not sustain this finding and therefore the proper measure of damages was the difference between the contract and market prices of similar quality and quantity rather than loss of prospective profits. Plaintiff testified that he attempted to obtain replacement seed; that he could not obtain more than 73.1 pounds; that the only reason he was able to obtain that quantity was because the suppliers were eager to get his "trade." The evidence supports the finding.

*Olcese* v. *Davis,* 124 Cal.App.2d 58 [268 P.2d 175], cited by defendants to show the applicability of the rule determining damages by the difference between the contract and market prices of the goods, is not in point as in that case there was substantial evidence of the availability of the goods in the open market and no evidence whatsoever that the goods were unavailable to the plaintiff. In the present case, as we have stated, there was evidence that the seed was unavailable to plaintiff.

On breach of a contract, loss of profits shown to be the direct and natural result of the act or omission complained of may be recovered provided the amount thereof is shown with sufficient certainty. (*McKay* v. *Riley,* 65 Cal. 623 [4 P. 667].) Where resale by the purchaser is clearly within the contemplation of both parties, the failure of the sellers to deliver the goods thwarts that purpose and *directly* causes the loss of prospective profits. The law seeks to give the injured plaintiff the

value of his bargain and prevent the loss which fulfillment of the contract would have avoided. The contract in the present case contemplated resale of the seed. The evidence shows with reasonable certainty that plaintiff suffered loss of the profits contemplated by the contract and that such loss resulted directly from defendants' failure to deliver.

A further contention is that the amount of the loss of profits was not shown with certainty. Defendants assert the evidence was insufficient to establish what portion of the undelivered seed plaintiff would have sold and what the selling price thereof would have been. Undoubtedly in cases of this kind where the goods were purchased for resale in small quantities through a retail store, it is practically impossible to show exact dates resale could have been accomplished and the exact quantity and exact sale price of the goods that would have been resold by the purchaser. Citing *Grupe* v. *Glick*, 26 Cal.2d 680 [160 P.2d 832], defendants say the present case is analogous to the ''unestablished business'' cases. The rule in those cases is that where the operation of an unestablished business is prevented or interrupted, damage for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent, and speculative. The rule is not applicable to the facts at bar. The operation of plaintiff's nursery business was not prevented or interrupted. Although there was no evidence of a past volume of business in dichondra seed for previous years, there was, as we have stated, other evidence showing with reasonable probability that plaintiff would have been able to sell all of the seed. Plaintiff operated several retail nurseries. He had been in the nursery business since 1930 and had invested $4,500 cash to obtain the seed. His purchase was made to fill his estimated needs for the year. There was a shortage of the product and an unprecedented demand for the seed due to a building boom in his areas. It is reasonable to infer his estimate took into consideration his past experience and present conditions. There was testimony that plaintiff readily sold all of the seed he did obtain—744 pounds in four months—and during that period repeatedly called for more seed; that during November and December, 1954, plaintiff sold the 73.1 pounds of seed at $3.98 a quarter pound; that he tried to obtain seed from other suppliers but was unsuccessful. The evidence was sufficient to permit the inference drawn by the court that there was a reasonable probability sales of the balance of the seed would have resulted.

Similarly, the evidence that plaintiff sold the 73.1 pounds obtained through other suppliers during the months of November and December at $3.98 a quarter pound showed the actual selling price obtained during part of the time which was contemplated for the resale of the balance of the seed. Since plaintiff sold all he could obtain at $3.98 a quarter pound, the inference that the selling price would not have dropped during the time resale could have been accomplished was justified when considered with the testimony that there was a shortage and large demand.

One whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness. (*Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297 [149 P.2d 177].)

"There may be some element of uncertainty but not such a degree of uncertainty as to render the testimony speculative. There is no uncertainty as to the fact of damage, that is, as to the nature, existence or cause of the damage. The same certainty as to the amount of the damage is not required." (*Flagg* v. *Andrew Williams Stores, Inc.*, 127 Cal. App.2d 165, 173 [273 P.2d 294].)

Defendants claim error in the computation of damages in the amount of $7,000 based on loss of profits on unprocurable seed. Plaintiff was unable to obtain 1,182.9 pounds of seed from any source. He would have been able to sell this amount at $15.92 a pound ($3.98 a quarter-pound jar) for a total of $18,831.76. The contract price of $4.00 a pound for this amount of seed was $4,731.60. The difference between the selling price and the contract price is $14,100.16. Plaintiff claimed his gross profits would have been $13,248.48. The trial court explained by memorandum opinion its award of $7,000 was made to take into consideration any cost to plaintiff of "such ordinary business expenses as are usually and generally incurred in matters of this kind."

Defendants recite the general rule for the computation of damages where the loss of profits is a factor as stated in *Olcese* v. *Davis*, 124 Cal.App.2d 58, 62 [268 P.2d 175], that the defendant is required to pay the plaintiff only the net profits, not gross profits. Defendants' contention is that plaintiff failed to show any costs of resale. This, of course, assumes that in such cases there are always costs of resale.

"Under certain circumstances, however, as where, for example, the plaintiff's expenses of operating his busi-

ness are fixed and would have continued in an equal amount even if the contract had not been breached by the defendant, an award of gross profits may be allowed to the plaintiff, since, in such a situation, the gross profits involved would also constitute the net profits which the plaintiff would have earned under the agreement." (14 Cal.Jur.2d 762, § 134; *Phalanx Air Freight, Inc.* v. *National Skyway Freight Corp.,* 104 Cal.App.2d 771 [232 P.2d 510]; *Walpole* v. *Prefab Mfg. Co.,* 103 Cal.App.2d 472 [230 P.2d 36].)

There was evidence from which it could have been inferred that plaintiff's expenses of operating his business were fixed and that no additional expenditures were necessary to resell the seed. Plaintiff's nurseries were ''self-service'' operations. He received and resold the 744 pounds of seed from defendants in quarter-pound jars and was to receive the balance so packaged. The balance of the seed was to be held in defendants' warehouse until delivery was requested by plaintiff. Since it appears that the only handling of the seed which would have been required of plaintiff would have been opening cartons, displaying the jars, putting the jars in sacks for customers, and collecting payment therefor, and that his expense of operating the business would have continued had the contract not been breached, the statement of the court in *Phalanx Air Freight, Inc.* v. *National Skyway Freight Corp., supra,* 104 Cal.App.2d 771, is applicable (p. 775): ''The loss of gross profit is a proper item of damage since plaintiffs are out of pocket that amount through the defendant's breach, but their expenses of operating the business would as well have continued if the contract had not been breached.''

*Oakland California Towel Co.* v. *Sivils,* 52 Cal.App.2d 517 [126 P.2d 651], states the rule applicable at bar with acuity. The court said (p. 520):

'' [T]he true rule seems to be that the *prospective* profits should be diminished by charges composing an essential element in the cost of manufacture, or, as in this case, of service. Essential elements in such cost do not include remote costs, overhead or otherwise, but are confined to expenditures that would necessarily have been made in the performance of the contract. The only matter of concern is the detriment suffered or benefit lost as the result of the breach. If the fixed expenses neither increased nor decreased as a consequence of the nonperformance of the contract, there

would be no loss or benefit arising from that factor.'' (Emphasis added.)

 · Since the evidence with respect to loss of profits would have supported a larger award than was actually given, defendants cannot, on review, complain of the award or a supposed lack of evidence to sustain it. (*Sobelman* v. *Maier*, 203 Cal. 1, 9 [262 P. 1087] ; *Rauer* v. *Nelson & Sons*, 53 Cal.App. 695, 700 [200 P. 809].) The award for loss of profits must stand.

 Defendants' ultimate assignment of error is that the award of interest on the entire amount of the judgment from November 1, 1954, was erroneous. Section 3287 of the Civil Code provides :

''Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day. . . .''

''As a general rule interest in the form of damages is not allowed prior to rendition of judgment on an unliquidated claim or on the amount of a demand which cannot be ascertained either from the face of the contract or by reference to a well-established market value.'' (*Maurice L. Bein, Inc.* v. *Housing Authority*, 157 Cal.App.2d 670, 686 [321 P.2d 753].) The allowance of interest on the award of $7,000 for loss of prospective profits was manifestly error. That claim was unliquidated. The computation of damages for loss of profits could not be based on an established market price at a particular time. It was necessary to determine by inference from the evidence the probable prices at which the seed would be resold. (See *Lineman* v. *Schmid*, 32 Cal.2d 204, 212 [195 P.2d 408, 4 A.L.R.2d 1380].) Interest was properly awarded on $1,140.70, the excess of plaintiff's advance payment over the amount he paid for the 744 pounds of seed delivered at the contract price of $4.00 a pound, less the offset, and on $292.40, the difference between the contract price and the price plaintiff paid for 73.1 pounds of seed. These amounts were certain or capable of being made certain by calculation.

· The judgment is modified by striking therefrom the words ''Interest thereon'' and inserting in place thereof the words and figures ''Interest on $1,433.10.'' As thus modified, the judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.