[Civ. No. 32082. Second Dist., Div. One. July 31, 1968.]

DULIEN STEEL PRODUCTS, INC., OF WASHINGTON et al., Plaintiffs and Respondents, v. A. J. INDUSTRIES, INC., Defendant and Appellant.

542

William D. Moore for Defendant and Appellant.

Harry L. Schuman for Plaintiffs and Respondents.

WOOD, P. J.—Plaintiffs Dulien Steel Products, Inc., and Railwater Terminal Co. seek damages for breach of contract by defendant A. J. Industries, Inc. (referred to as A. J.) wherein plaintiffs had agreed to pay $50,000 in order to acquire (for resale) certain machinery, structures, and supplies which A. J. had at its gold mine in Juneau, Alaska. In a nonjury trial, judgment was in favor of plaintiffs for $99,807. Defendant appeals from the judgment.

Appellant (A. J.) contends that the alleged agreement was unenforceable because it was uncertain and because it was entered into by an employee of A. J. without authority from A. J.; and that the court erred in receiving certain evidence and in awarding damages to plaintiffs.

Defendant A. J. Industries owned a gold mine and mill buildings in Juneau, Alaska. The mill buildings were on a hillside, and the mine was behind the buildings. In and around the buildings there were rails, machinery, equipment, piping, wiring and supplies (referred to collectively as "mill facilities") used in the processing of gold ore. There was also a large hoist (and a small hoist) inside the mine. In 1962, the mine was not in production, and A. J. desired to sell the mill facilities.

Mr. Schwartz, who is the president of plaintiff Railwater, was engaged in the salvage business and was interested in purchasing and removing salvageable materials owned by A. J. In the fall of 1962, Mr. Schwartz went to Juneau and inspected the facilities at the mine. Thereafter, he had discussions with Mr. Ver Halen, who is the president of A. J., and Mr. Whitaker, who is director of research and development for A. J. Also, there was correspondence between Mr. Schwartz and Mr. Ver Halen—which letters were on stationery of the general offices of A. J.

Plaintiffs (Railwater Terminal Co. and Dulien Steel Products, Inc.) formed a joint venture and offered $50,000 to A. J. for the purchase and removal of the facilities. On January 23, 1964, Mr. Whitaker telephoned Mr. Schwartz and told him that A. J.'s board of directors had authorized Mr. Ver Halen to accept the offer.

On January 30, 1964, Mr. Schwartz, Mr. Dulien (president of Dulien Steel Products), Mr. Ver Halen, and Mr. Whitaker, met at A. J.'s offices and discussed the details of the transaction. Mr. Whitaker made notes during the discussion and then went into another office and prepared a typewritten document

(plaintiff's Exhibit 1) from the notes. Mr. Whitaker showed the document to Mr. Ver Halen, who discussed it with Mr. Schwartz and Mr. Dulien. Some corrections were made and "initialed," and the document was signed: "DULIEN STEEL PRODUCTS INC. and RAILWATER TERMINAL CO. a Joint Venture" by Louis Dulien and Louis Schwartz; and "A. J. INDUSTRIES, INC." by Glenn G. Whitaker.

The document consists of two pages (nine paragraphs) and is entitled "Letter of Intent."[1] It provides in substance as follows:

In consideration of $50,000, A. J. will sell, assign and transfer to Dulien and Railwater all structures, machinery, equipment and supplies, including wiring, piping and rails located "in and around the mill building facilities" of the Alaska Juneau mine as well as those buildings, stores and supplies located on the waterfront of A. J. property except those items already marked to be held for A. J. Dulien and Railwater will remove all hillside structures, including mill buildings and connecting tramway, down to the cement foundations. A. J. will destroy and burn all wood structures and will have claim to all gold recoverable therefrom. A. J. will have the right to all gold which A. J. recovers from other equipment. Carpenter shop buildings, structures withheld at the request of the Chamber of Commerce, and power plant buildings are excluded from the sale. The sale and removal of the hoists in the mine are not a part of this contract, but will be covered by a supplemental letter to be written covering the sale and removal of these units after final inspection by Mr. Schwartz on or about February 8, 1964.[2] Payment for this contract shall be $25,000 in cash and $25,000 payable six months from the date of execution of the contract. (Other provisions relate to the right of Dulien and Railwater to construct dock facilities, insurance coverage by Dulien and Railwater, and A. J.'s warranty that the materials are free from encumbrances.)

---

[1]The word "Contract," which appears in type at the top of the document has been lined out and replaced by the handwritten words "Letter of Intent."

[2]After the letter of intent had been signed, they discussed removal of the large hoist from the mine for salvage by A. J. Ver Halen asked Schwartz if he (Schwartz) could help A. J. "realize" $115,000 for the hoist, and Schwartz said that he would go to Juneau, inspect the hoist, "canvass the market," and give A. J. his opinion as to the best plan for selling the hoist. There was evidence that Schwartz would aid in the sale of the hoists on a commission basis.

After the document was signed, Mr. Schwartz tendered a check for $25,000 to Mr. Whitaker, who said the check was not necessary—that Mr. Schwartz would receive a formalized agreement and could send the check after the formalized agreement was signed.

On February 4, 1964, A. J.'s board of directors adopted a resolution[3] in part as follows: Resolved that the president be, and he is hereby authorized to enter into a transaction in behalf of the company for the sale of all junk, spare parts, and other personal property now located in the mill buildings for $50,000 cash; provided, however, that the purchaser shall, at no cost to the company, dismantle and remove the mill buildings, remove the two hoists from the mine, and place the hoists aboard ships to Seattle.

On February 8, 1964, Schwartz and a wrecking contractor (George Adams) went to the mine to inspect the hoist, which was about a mile and a quarter down the tunnel of the mine. When Schwartz and Adams had gone into the mine tunnel about halfway to the place where the hoist was, they noticed that there had been several slides, one of which "practically closed" the tunnel. They did not go any farther, and Schwartz did not see the hoist. (The contractor had inspected the hoist previously.) When Schwartz returned to Seattle, he told Whitaker what he had "encountered" at the mine and that they should discuss a program for recovering the hoist. On February 13, 1964, Whitaker telephoned Schwartz and said that "the deal was off." On February 18, 1964, Whitaker wrote a letter to Schwartz wherein it is stated, among other things: "As a result of information received from our Alaska Juneau office in conjunction with the offer made in the Letter of Intent we find that the amount of money to be spent by A. J. Industries, Inc., in order to salvage the large hoist in the mine is far greater than anticipated." It was also stated that the letter of intent must be terminated, that Ver Halen has been instructed to consider the possibilities for sale of the mine material, and that A. J. would like to reimburse Schwartz for expenses incurred by him on his trip to Juneau. There were further telephone calls and correspondence between the parties, and in July 1964 plaintiffs filed the herein action for damages for breach of the agreement (letter of intent) of January 30, 1964. Defendant's answer included

---

[3] The minutes of the meeting were not signed by Ver Halen until July 13, 1966.

alleged defenses that the letter of intent was not a binding contract, and that Whitaker lacked authority from A. J. to enter into an agreement for the sale of the assets described in the letter of intent.

Some of the findings are in substance as follows:

On January 30, 1964, plaintiffs and defendant entered into a written agreement as follows: (Document of January 30, 1964, is set forth in full in the findings.) Prior to January 30, 1964, defendant entrusted to Whitaker and his superior, Ver Halen, the entire matter of dealing with the mine property, which contemplated the sale of the property to plaintiffs. Whitaker was an employee of defendant, and Ver Halen was president of defendant, and they were authorized to sell and dispose of the mill properties subject to the agreement of January 30. Whitaker and Ver Halen represented to plaintiffs that they were authorized to act on behalf of defendant. Such authorization was "oral and was not in writing." Plaintiffs were ready, able and willing to perform all of the conditions and covenants of the agreement on their part to be performed. The agreement of January 30 embodied all of the terms and understandings of the parties in relation to the items to be purchased and sold. The sale and removal of the hoist located in the mine was not a part of the agreement of January 30, and it was specifically excluded therefrom. The only provision of the agreement relating to the hoist is paragraph 5. At no time before the filing of the action did defendant tell plaintiffs, or take the position, that Whitaker had no authority to execute the agreement of January 30 on behalf of defendant. Between January 30, 1964, and February 13, 1964, neither Whitaker nor Ver Halen nor anyone informed plaintiffs that the board could not consider the deal unless it included disposition of the hoist. Defendant's oral and written communications to Schwartz after February 4, 1964, were inconsistent with the action of the board of directors of defendant at its meeting of February 4, with relation to the agreement with plaintiffs, so as to indicate bad faith on the part of defendant. The conduct of the representatives of defendant in failing t ₁ state that they did not have written authority to act on behalf of defendant and in knowingly leading plaintiffs to believe that they were authorized to so act, induced Schwartz, on behalf of plaintiff, to rely on such apparent authorization, and Schwartz did expend substantial time, money, and effort in reliance on the agreement to travel from Seattle to Juneau to inspect the interior of the mine, the mine hoists, the dock

sites, labor conditions, and the construction of a road to the mill site. Defendant thereafter offered to reimburse Schwartz for his expenses, and he did not accept the offer. The materials to be acquired by plaintiffs under the agreement were parts of mining equipment which had been used by defendant at the mine, and the materials would have had to be recovered by dismantling substantial structures and shipping them by barge to the closest available market. Other salvageable materials comparable to the materials at the mine were not available for purchase by plaintiffs. Defendant knew that plaintiffs were engaged in the salvage business, and all parties to the agreement contemplated that plaintiffs were acquiring the salvageable materials for resale for profit and that plaintiffs were not acquiring the materials for their own use. There was excluded from the agreement anything beyond the trestle adjacent to the mill building extending toward the mine, and anything around the mine or mine entrance. Plaintiffs had experience for about 30 years in the type of business of this joint venture prior to entering the agreement and had liquidated similar facilities previously.

Other findings, in detail, relate to the reasonable price per pound which plaintiffs could expect to realize from the resale of the materials. It is stated that such prices are also the minimum costs at which plaintiffs could have acquired such materials if purchased in Seattle at then current prices; and that the gross proceeds so recoverable are $333,770.

Other findings, in detail, relate to deductions in the amount of $233,963 to be made from the gross proceeds. Such deductions are the costs ($175,203) which plaintiffs would have incurred in removing the materials and transporting them to Seattle; the cost ($360) of dismantling and transporting copper wire; the compensation ($8,400) payable to the wrecking contractor; and the contract price ($50,000).

Some conclusions of law were in substance that the document of January 30, 1964, was a binding, valid, and enforceable contract for the purchase and sale of the items described therein; defendant is estopped from asserting that its representatives had no written authorization to execute the contract on behalf of defendant; the contract was breached by defendant on February 13, 1964; plaintiffs are entitled to recover the loss of profits resulting from defendant's breach of the contract; and plaintiffs suffered damages in the amount of $99,807.

The judgment is for $99,807 (which is the remainder after subtracting the deductions [$233,963] from the gross proceeds [$333,770]).

■ Appellant contends that the letter of intent is not an enforceable contract because it is uncertain. It argues that the letter contains an indefinite promise to agree in the future— that even though the removal of the hoist was not a "part" of the agreement relating to the mill facilities, the removal of the hoist was "inter-dependent" with the removal of the mill facilities; and that the provision in the letter of intent relating to removal of the hoist left the terms and conditions of such removal "for the future determination of the parties."

As above shown, the only provision of the letter of intent relating to the hoist was paragraph 5 which provides that the "sale and removal of the hoists in the mine are not part of this contract but will be covered by a supplemental letter to be written covering the sale and removal of these units after final inspection by Mr. Louis Schwartz on or about February 8, 1964." The court found that the document of January 30, 1964, was a binding, valid and enforceable contract; that said contract embodied all of the terms and understandings of the parties; that the sale and removal of the hoists were not part of the contract; and that paragraph 5 was the only provision of the contract relating to the hoists. There was evidence to the effect that plaintiffs sought to acquire for salvage and resale only those facilities "in and around" the mill buildings (referred to as "mill facilities"); on the day when the document was signed, the representatives of the parties discussed the details of the transaction, and a representative of defendant took notes and prepared the document; and after the document was signed, there was a discussion regarding removal of a hoist for salvage and resale by defendant, during which discussion Schwartz, who was experienced in the salvage business, was asked to inspect the hoist and suggest the best plan whereby defendant could sell it. There was a conflict in the evidence as to what defendant intended to do with the hoist. There was substantial evidence, however, including the express provisions of the contract, to support the findings that the removal of the hoist was not part of the contract for the purchase and sale of the mine facilities, and that the letter of intent was a valid and enforceable contract embodying all the terms and understandings relating to the purchase and sale of the mill facilities.

■ Appellant further contends that the agreement is unenforceable because Whitaker did not have authority in writing to enter into such an agreement on behalf of A. J. The court found that Whitaker was an employee, and Ver Halen was president, of defendant and that they were authorized to sell and dispose of the mill facilities; they represented to plaintiffs that they had such authority; and defendant did not tell plaintiffs, or take the position, that Whitaker lacked such authority until the herein action was filed (July 27, 1964). There was evidence to the effect that prior to January 30, 1964, defendant had authorized Ver Halen (defendant's president) and Whitaker (employee under Ver Halen's supervision) to handle the proposed sale of the mill facilities; after plaintiffs made an offer, Ver Halen discussed the details of the transaction with Schwartz and Dulien at a meeting in A. J.'s offices on January 30; Whitaker took notes during the meeting, and then went to another room and prepared a typewritten document, in the form of a contract or letter of intent; Whitaker returned to the room where the meeting was held and showed the document to Ver Halen, corrections were made, the corrections were initialed, and Whitaker signed the document on behalf of defendant (cf. *Murphy* v. *Munson,* 95 Cal.App.2d 306, 311-313 [212 P.2d 603]); and a few days thereafter (February 4) defendant's board of directors passed resolutions which in effect authorized the sale of the mill facilities to plaintiffs. The evidence supports the findings with reference to the authority of Whitaker and Ver Halen to enter into the contract on behalf of defendant.

■ Appellant also contends that the court erred in receiving evidence which appellant asserts was hearsay.

Schwartz, who had many years of experience in the salvage business, and who had hired barges for transportation of salvageable materials, gave detailed testimony, on the issue of damages, regarding the costs of salvaging materials of the kind included in the mill facilities, and the costs of transporting such materials from Juneau to Seattle. Part of his testimony was that he had received "quotations" from the Foss Towboat Company in Seattle for the transportation of such materials, by barges from Juneau to Seattle, at the cost of $7 per ton. Defendant moved to strike such testimony,[4] and the

---

[4]It does not appear that defendant objected to the testimony. The testimony is at page 720 of the reporter's transcript. The motion to strike is at page 1081 of the transcript.

motion was denied. After Schwartz' testimony, and before the motion to strike was made, Mr. Potter, who was called as a witness by defendant, testified without objection that he had received a quotation that the cost of transporting such materials by barge from Juneau to Seattle would be $8 per ton. In ruling on the motion to strike, the judge stated that there was "sufficient evidence in the record to show that Mr. Schwartz is qualified as an expert in this entire field of salvage operations and all costs connected with such operations, including the costs of dismantling plants, hiring of barges and the like." The court did not err in receiving the testimony regarding the quoted cost of transportation. (See Evid. Code, § 801; *Hammond Lumber Co.* v. *County of Los Angeles,* 104 Cal.App. 235, 248 [285 P. 896].) The weight to be given the testimony of Schwartz and Potter relating to the costs of barge transportation was a matter for the trial court. (See *Gollaher* v. *Midwood Constr. Co.,* 194 Cal.App.2d 640, 650 [15 Cal.Rptr. 292].)

Appellant further contends that the court erred in awarding any damages to plaintiffs. It argues that plaintiffs were not ready, willing and able to perform the contract; that damages were remote, speculative, and uncertain; and that the doctrine of estoppel cannot be used as an instrument of gain and profit.

In support of its argument that plaintiffs were not ready, willing and able to perform, appellant asserts that the wrecking contractor (Adams) was working at, and had his equipment at, other projects, and plaintiffs engaged in other profitable deals, following defendant's termination of the contract. The court found that the agreement was made on January 30, 1964, that the contract was breached (terminated) by defendant on February 13, 1964, and that plaintiffs were ready, willing and able to perform all of the conditions and covenants of the agreement on their part to be performed. There was ample evidence that plaintiffs were ready, willing and able to perform the agreement when defendant breached it. There is nothing in the agreement which required plaintiff corporations to devote all, or the greater portion, of their business activities to the removal of the mill facilities or which precluded plaintiffs from contemporaneously performing other contracts. (See *Payne* v. *Pathe Studios, Inc.,* 6 Cal. App.2d 136, 142 [44 P.2d 598]; *Gollaher* v. *Midwood Constr.*

*Co., supra,* p. 651.) It was not incumbent upon plaintiffs to refrain from engaging in other activities.[5]

█ In support of its argument that damages were speculative and remote, appellant asserts that any damages suffered by plaintiffs depended upon the ability of Adams (wrecking contractor) to dismantle the mill facilities, and upon adequate barges being available to transport the salvaged materials to Seattle. Mr. Schwartz testified in effect that barges were available at $7 per ton and Potter (called by defendant) testified that barges were available at $8 per ton. Adams had inspected the mine and had apparently contracted with plaintiffs to dismantle the mill facilities. Appellant cites no evidence in the record showing that Adams was incapable of dismantling the facilities. That the computation of damages might be difficult to ascertain would not preclude recovery of damages. (*Stott* v. *Johnston,* 36 Cal.2d 864, 875 [229 P.2d 348].)

Appellant's argument regarding the use of estoppel as an instrument of gain is that the court, in finding that defendant was estopped to deny that Whitaker had authority in writing to enter into the contract, used estoppel as a means of determining that the contract was enforceable. This argument is a variation of appellant's argument relating to the authority of Whitaker and Ver Halen to enter into the contract. As above stated, the court did not err in finding that they had authority to enter into the contract on behalf of A. J.

█ Appellant further contends that the court applied an improper measure of damages—that the court awarded loss of anticipated profits, whereas the measure of damages should have been "the difference between the contract price and the market price."

A similar contention was made in *Irving Tier Co.* v. *Griffin,* 244 Cal.App.2d 852, 866-867 [53 Cal.Rptr. 469], wherein the trial court awarded loss of anticipated profits to a "middleman" who bought goods from manufacturers for resale to convalescent hospitals. The profits were based upon the difference between the middleman's purchase price and his selling price. The judgment was affirmed on appeal, and it was said (p. 867): "There is ample authority to the effect that an award of damages based upon the difference between the con-

---

[5]It should also be noted that defendant did not plead facts raising an issue of mitigation of damages. (See *Danelian* v. *McLoney,* 124 Cal. App.2d 435, 443 [268 P.2d 775]:)

tract price and the market price does not adequately compensate a middleman upon his buyer's repudiation of an agreement to purchase goods from him, but that the proper measure of damages in such a case is the dealer's anticipated profit." It was also said (p. 871) that the measure of damages provided for in section 3300 of the Civil Code is the correct measure under which a middleman may recover his loss of profits. (Civ. Code, § 3300, provides that for breach of an obligation arising from contract, the measure of damages is the amount which will compensate the party aggrieved for all detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.)

In other cases, loss of anticipated profits have been awarded for repudiation of contracts for the sale of goods where resale of the goods was contemplated by the parties to the contract. (See *Tomlinson* v. *Wander Seed & Bulb Co.*, 177 Cal.App.2d 462, 471-473 [2 Cal.Rptr. 310], wherein loss of anticipated profits were allowed, under Civ. Code, § 3300, for breach of a contract to sell seed; *Grupe* v. *Glick*, 26 Cal.2d 680, 687-689 [160 P.2d 832]; *Morello* v. *Growers Grape Prod. Assn.*, 82 Cal.App.2d 365, 375-376 [186 P.2d 463]; 1 Witkin, Summary of Cal. Law, Contracts, pp. 310-311, § 281.)

In the present case, the court found that defendant knew that plaintiffs were engaged in the salvage business and that the parties to the agreement contemplated that plaintiffs were acquiring the salvageable materials for resale at a profit. It was also found that other comparable materials were not available for salvage,[6] and that the agreement was intended to be a complete package operation. (Schwartz testified that salvageable materials such as those at the Juneau mine were not available for sale in 1964. Potter, called by defendant, testified that such materials were not available "in one lot," and that it was "very rare that a variety and quantity such as this would come up.") Defendant's breach (repudiation) of the contract prevented plaintiffs from salvaging and reselling any of the materials. In the circumstances, the court could properly award plaintiffs the loss of anticipated profits resulting from defendant's breach.

The amount of damages ($99,807) awarded as loss of profits was not speculative or remote. Said amount was the

---

[6]In the *Tomlinson* case, *supra*, p. 472, it was said: "Whether there was an available market, and whether, if there was not, a particular loss directly and naturally resulted in the ordinary course of events from defendants' breach, are questions of fact."

difference between the gross price ($333,770) for which the materials could have been sold at the nearest market and the gross cost ($233,963) to plaintiffs of purchasing and dismantling the materials and transporting them to the market. There was detailed evidence of the prices for which the materials could be resold at the nearest market, and of the costs which would be necessarily incurred in purchasing and dismantling the materials and transporting them to the market. "It is well established that damages consisting of the loss of anticipated profits need not be established with certainty. It is sufficient that it be shown as a reasonable probability that the profits would have been earned except for the breach of contract." (*Hacker etc. Co.* v. *Chapman V. Mfg. Co.*, 17 Cal.App.2d 265, 267 [61 P.2d 944]; see *Pacific Scientific Co.* v. *Glassey*, 245 Cal.App.2d 831, 842-843 [54 Cal. Rptr. 235]; *Mahoney* v. *Founders' Ins. Co.*, 190 Cal.App.2d 430, 436 [12 Cal.Rptr. 114]; *Tomlinson* v. *Wander Seed & Bulb Co., supra*, pp. 473-474.) "[T]he fact that the amount of damage may not be susceptible of exact proof, or may be uncertain, contingent or difficult of ascertainment does not bar recovery." (*Ely* v. *Bottini*, 179 Cal.App.2d 287, 295 [3 Cal.Rptr. 756]; see *Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297-298 [149 P.2d 177].) The court did not err in awarding damages.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied August 26, 1968, and appellant's petition for a hearing by the Supreme Court was denied September 25, 1968.